UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                       )
IN DEFENSE OF ANIMALS, *et al.*,        )
                                       )
          Plaintiffs,                  )
                                       )
     v.                                )          Civil Action No. 09-2222 (PLF)
                                       )
KEN SALAZAR, *et al.*,                  )
                                       )
          Defendants.                  )
_____)


OPINION

          Plaintiffs, In Defense of Animals, Craig C. Downer, and Terri Farley, move for a

preliminary injunction that would bar the defendants, Secretary of the Interior Ken Salazar and

various administrators and employees of the Interior Department's Bureau of Land Management

("BLM"), from implementing a plan to capture or gather approximately 2,700 wild horses

located in western Nevada ("gather plan").  The plaintiffs contend that the gather plan must be

set aside pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*., because BLM

lacks the statutory authority to carry out the actions proposed, and because those actions

contravene the terms of the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act"), 16

U.S.C. §§ 1331 *et seq.*  The Court heard oral argument on December 16, 2009.  Upon

consideration of the relevant legal authorities, the parties' arguments, and the entire record in

this case, the Court will deny the plaintiffs' motion.[1]

_____

[1]     The papers considered in connection with this matter include: plaintiffs' Complaint
("Compl."); plaintiffs' First Amended Complaint ("Am. Compl."); plaintiffs' Motion for
Injunctive Relief ("Mot."); plaintiffs' Memorandum of Points and Authorities in Support of
Injunctive Relief ("Mem."); defendants' opposition to plaintiffs' motion ("Opp."); plaintiffs'
reply to defendants' opposition ("Reply");  BLM's Final Environmental Assessment, Opp., Ex.

I.  FACTS

According to BLM, approximately 3,040 wild horses currently inhabit the Calico
Mountains Complex ("Complex"), a 550,000 acre expanse of land located in Nevada's
Humboldt and Washoe counties.  EA at 1.  A mix of government-owned and privately-held
tracts of land, the Complex includes mountainous and desert regions and is home to a variety of
wildlife species, including coyotes, mule deer, and pronghorn antelope.  Id. at 45.  BLM also
allows several private entities to graze herds of domestic cattle on public lands in the area.  Id. at
29.

In 1982 BLM established a "multiple use balance between livestock, wild horses,
and wildlife" in the Complex, allocating a certain amount of available forage resources in the
area to wild horses and earmarking the rest for other uses.  EA at 2.  Based on that initial
assessment, the agency set target population levels for wild horses in the Complex in the early
1990s and then, in subsequent years, adjusted those levels intermittently in response to, among
other factors, reassessments of available resources in the Complex.  Id.  According to BLM,
these target population levels — known as "appropriate management levels" or "AMLs," id. at 1
— represent the maximum number of wild horses that may inhabit the Complex without
threatening the area's "thriving natural ecological balance and multiple-use" character.  Id. at 2.
Currently, the AML for wild horses in the Complex is between 572 and 952 horses.  Id. at 3.

The 3,040 horses currently estimated to live within the Complex exceed the
minimum AML of 572 by 2,468, and the maximum AML of 952 by 2,088.  To bring the horse
population below the maximum AML, BLM has developed a plan to capture most of the

---

A ("EA"); and defendants' Notice of Filing in Response to a Request from the Honorable Paul
L. Friedman ("Defs. Resp.").

Complex's horses and take them from the range.  EA at 4.  Under this gather plan, BLM will use helicopters to herd up to 2,736 wild horses into temporary corrals located within or just outside the Complex.  EA at 13; Transcript of Oral Argument, Dec. 16, 2009 ("Trans.") at 34.  The horses then will be transported to a larger temporary holding facility nearby.  Trans. at 33.  If the total number of horses captured by BLM exceeds 2,432, then a fraction of the horses — up to 268 — will be released back into the Complex.  EA at 13.  To minimize population growth, BLM will choose the group of horses to be released so that its composition is sixty percent male, and will also treat mares to be released with a contraceptive vaccination.  Id.

Of those horses that are not released, any with "[c]onditions requiring humane euthanasia" — old, sick, or lame horses — will be destroyed after examination by a veterinarian. EA at 12.  All remaining horses will "be transported to BLM facilities for adoption, sale, or long-term holding."  Id.  BLM's long-term holding facilities are located in Kansas, Oklahoma, and South Dakota.  Reply at 7.[2]

BLM's Preliminary Environmental Assessment, which outlined the proposed gather plan, was released on October 23, 2009.  Believing that implementation of the gather plan was "to begin directly on December 1, 2009," see Compl. ¶ 3, plaintiffs filed this suit on November 23, 2009, and their motion for a preliminary injunction two days later.  BLM, however, decided to delay the initiation of the gather process.  Opp. at 13.  The Bureau's Final Environmental Assessment, Decision Record, and Finding of No Significant Impact ("FONSI") were issued on December 8, 2009.  Opp., Ex. B (FONSI) at 4; Opp., Ex. C (Decision Record) at

---

[2]    The plaintiffs have alleged that these three states contain all of BLM's long-term holding facilities, see Reply at 7, and the defendants have not disputed that claim.

17. Plaintiffs filed an amended complaint on December 14, 2009. The gathering of horses from the Complex is now scheduled to begin on December 28, 2009. Am. Compl. ¶ 4.

## II. RELEVANT LEGAL STANDARDS

### A. Preliminary Injunction Factors

A preliminary injunction is "an extraordinary remedy that should be granted only when the [parties] seeking the relief, by a clear showing, carr[y] the burden of persuasion." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004)) (internal quotation marks omitted). To warrant preliminary injunctive relief, the moving parties must show: (1) that there is a substantial likelihood that they will succeed on the merits of their claim, (2) that they will suffer irreparable injury in the absence of an injunction, (3) that an injunction would not substantially harm the defendants or other interested parties (balance of harms), and (4) that the public interest would be furthered, or at least not adversely affected, by the injunction. See id.; Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291 (D.C. Cir. 2009); Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).

Plaintiffs are not required to prevail on each of these factors. Rather, these factors must be viewed as a continuum, with more of one factor compensating for less of another. Davis v. Pension Benefit Guar. Corp., 571 F.3d at 1291-92. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995). An injunction may be justified "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." Id. Conversely, when

the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a "substantial" case on the merits.  The necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of the other factors.  Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843-45 (D.C. Cir. 1977).  An injunction may be issued "with either a high probability of success and some injury, or vice versa."  Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985).  "Despite this flexibility," however, "a movant must demonstrate at least some injury for a preliminary injunction to issue," and "a failure to show *any* irreparable harm" constitutes grounds for denying the motion for a preliminary injunction, "even if the other three factors entering the calculus merit such relief."  Chaplaincy of Full Gospel Churches v. England, 454 F.3d at 297 (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995) (internal quotation marks omitted), and citing Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1210-11 (D.C. Cir. 1989)) (emphasis added).

### B.  The Administrative Procedure Act

Under the Administrative Procedure Act, a reviewing court must hold unlawful and set aside "final agency action[s]" that are "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C); see id. § 704.  Plaintiffs argue that BLM lacks statutory authority under the Wild Horse Act to institute the proposed gather plan and that the plan therefore must be set aside under the APA.[3]

---

[3]     The defendants contend that the plaintiffs' motion must be denied because the original complaint in this matter was filed prior to the issuance of BLM's Decision Record, Final Environmental Assessment, and Finding of No Significant Impact, which together constitute the relevant "final agency action" within the meaning of the APA.  Opp. at 11-13.  The plaintiffs

When, as here, the action under review involves an agency's interpretation of a statute that the agency is charged with administering, courts apply the familiar analytical framework set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). "Under step one of Chevron, [the court] ask[s] whether Congress has directly spoken to the precise question at issue, in which case [the court] must give effect to the unambiguously expressed intent of Congress." Secretary of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d 1066, 1073 (D.C. Cir. 2007) (internal quotation marks and citation omitted); see also Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. at 842-43. If, after employing the traditional tools of statutory construction, the court concludes that "the statute is silent or ambiguous with respect to the specific issue . . . , [the court] move[s] to the second step and defer[s] to the agency's interpretation as long as it is 'based on a permissible construction of the statute.'" Secretary of Labor, Mine Safety and Health Admin. v. Nat'l Cement Co. of California, Inc., 494 F.3d at 1074 (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. at 843).

### C. The Wild Horse Act

The Wild Horse Act places "[a]ll wild free-roaming horses and burros . . . under the jurisdiction of the Secretary for the purpose of management and protection in accordance with the provisions of" the statute. 16 U.S.C. § 1333(a). As used in the statute, the term

filed this suit on November 23, 2009, challenging the gather plan proposed in BLM's Preliminary Environmental Assessment. After the Final Environmental Assessment, the Decision Record, and FONSI were issued on December 8, 2009, the plaintiffs amended their complaint to focus on those documents, rather than on the Preliminary Environmental Assessment. Am. Compl. ¶ 7. That amendment cured any defect in the original complaint and in no way prejudiced the defendants, who have themselves stated that the final gather plan is substantively the same as the preliminary one. EA at 70.

"Secretary" refers to "the Secretary of the Interior when used in connection with public lands administered by him through the Bureau of Land Management and the Secretary of Agriculture in connection with public lands administered by him through the Forest Service." Id. § 1332(a). "[W]ild free-roaming horses and burros" are defined as "all unbranded and unclaimed horses and burros on public lands of the United States," id. § 1332(b); "public lands" are "any lands administered by the Secretary of the Interior through the Bureau of Land Management or by the Secretary of Agriculture through the Forest Service." Id. § 1332(e).

The management and protection duties specifically assigned to the Secretary by the Act consist of (1) prosecuting private persons who harass, capture, or kill wild horses, see 16 U.S.C. § 1338(a); (2) removing any wild horses that wander onto privately owned lands from public land, see id. § 1334; and (3) monitoring and regulating the population levels of wild horses on public lands. See id. § 1333(a)-(b).[4] BLM's proposed gather plan for the Calico Mountains Complex falls into the latter category of responsibilities. By mandate of the Wild Horse Act, BLM must "maintain a current inventory" of wild horses on the land the agency administers and, based on that inventory, determine "whether and where an overpopulation exists and whether action should be taken to remove excess animals." Id. § 1333(b). "[E]xcess animals" are those horses "which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area." Id. § 1332(f). To aid its ability to determine whether a given number of horses constitutes an "overpopulation" containing "excess animals," BLM is instructed to set "appropriate

_____

[4]     The Secretary has the same responsibilities toward wild burros that he does toward wild horses. For the sake of brevity, however, the Court will omit further references to burros, since this case does not concern them.

management levels of wild free-roaming horses" for the lands the agency administers.  <u>Id</u>.

§ 1333(b)(1).

BLM must "determine whether appropriate management levels should be

achieved by the removal or destruction of excess animals, or other options (such as sterilization,

or natural controls on population levels)."  16 U.S.C. § 1333(b)(1).  "Where [BLM] determines

. . . that an overpopulation exists on a given area of the public lands and that action is necessary

to remove excess animals, [the agency] shall immediately remove excess animals from the range

so as to achieve appropriate management levels."  <u>Id</u>. § 1333(b)(2).  The "range" is defined as

"the amount of land necessary to sustain an existing herd or herds of wild free-roaming horses

and burros, . . . which is devoted principally but not necessarily exclusively to their welfare in

keeping with the multiple-use management concept for the public lands."  <u>Id</u>. § 1332(c).  The

term "remove" is not defined within the statute, but the Act authorizes the BLM to "remove"

horses by euthanizing them or offering them for sale and/or adoption.  <u>See</u> <u>id</u>. § 1333(b)(2), (e).

"All management activities" of BLM "shall be at the minimal feasible level," <u>id</u>. § 1333(a),

presumably in keeping with Congress's express finding that wild horses should be "considered

in the area where presently found, as an integral part of the natural system of the public lands."

<u>Id</u>. § 1331.

## III.  DISCUSSION

According to the plaintiffs, the "gather" of wild horses in the Calico Mountains

Complex that has been proposed by BLM would exceed the authority conferred upon the agency

by the Wild Horse Act in two ways.  First, the plaintiffs argue that the indiscriminate herding of

up to ninety percent of the Complex's wild horse population into temporary corrals departs from

the procedure for "removal" mandated by the Act.  Reply at 2-6.  Second, the plaintiffs contend that BLM is only authorized by the statute to take one of three enumerated actions with respect to "excess" horses, and that those actions do not include placing the horses in long-term holding facilities for indefinite periods of time.  Reply at 6-7.  Those two distinct arguments on the merits also require differing analyses of the other preliminary injunction factors.  The Court therefore will discuss the merits, the possibility of irreparable injury, the balance of harms, and the public interest relevant to each separate argument.

### A.  Legality of BLM's Method for Gathering the Horses

#### 1.  Likelihood of Success on the Merits

Under the Wild Horse Act, once BLM has determined, as it has here, "that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, [the agency] shall immediately remove excess animals from the range so as to achieve appropriate management levels."  16 U.S.C. § 1333(b)(2).  "Such action" — that is, the removal of excess animals — "shall be taken in the following order and priority":

> (A)  [The agency] shall order old, sick, or lame animals to be destroyed in the most humane manner possible;
>
> (B)  [The agency] shall cause such number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which [it] determines an adoption demand exists by qualified individuals, and for which [the agency] determines [it] can assure humane treatment and care . . . ;
>
> (C)  [The agency] shall cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible.

16 U.S.C. § 1333(b)(2).

BLM contends that its gather plan complies with Section 1333(b)(2) because the agency will conduct the mandated "prioritization" after the vast majority of the Complex's horses are herded into temporary holding facilities.  Trans. at 23.  Once the horses are captured, BLM's veterinarians will identify and order the euthanization of animals with severe "pre-existing conditions" or injuries sustained during the herding process.  EA at 54, 12.  If the agency has captured more than the number of "excess" horses calculated to live in the Complex, then "non-excess" horses will be released back onto the range.  Id. at 13.  Remaining excess horses will be offered for adoption, and then those horses that are not adopted will be offered for sale and/or placed in long-term holding facilities in Kansas, Oklahoma, or South Dakota.   EA at 12.

The plaintiffs contend that BLM's reading of Section 1333(b)(2) contravenes "explicit [c]ongressional intent" and so must be rejected at Step One of the Chevron analysis. Mem. at 9.  They argue that the Wild Horse Act "mandate[s]" a so-called "tiered gather protocol."  Reply at 3.  Under the plaintiffs' reading of the Act, BLM must initiate the removal process by identifying and euthanizing "old, sick or lame" horses "on the range" — that is, while the horses are loose in the wild.  Id. at 4.  Once that step is complete, "healthy, adoptable horses" — also to be identified as such on the range, see Reply at 3 (quoting EA at 18) — may be captured and offered for adoption.  Id. at 5.  At no point may "non-excess, non-adoptable horses" be captured, held temporarily, and then subsequently released back into the Complex.  Id. at 6.

The Court concludes that the plaintiffs reach these conclusions by relying on a strained reading of the statute that is ultimately untenable.  First, the plaintiffs contend that horses are "removed" within the meaning of the statute whenever they are separated "from their natural habitat on the range." Reply at 4.  Thus, to herd a horse into a temporary corral is to

"remove" it, even if the horse is later released back onto the range.  See Reply at 6.  Because

Section 1333(b)(2) of the Wild Horse Act requires that old or sick horses be removed before

healthy, adoptable horses, under the plaintiffs' reading BLM cannot capture sick and healthy

horses all at once and then examine and sort them later; it must eliminate all old or infirm horses

before attempting to capture any healthy ones.

   The statute's text and purpose do not support this reading, much less require it.

Although the term "remove" is not defined in the statute, it is consistently used to refer to the

*permanent* separation of horses from a given area.[5]  When a horse population exceeds

appropriate management levels, horses are to be removed by euthanasia, sale, or adoption by

private individuals or entities — all permanent dispositions.  See 16 U.S.C. § 1333(b)(2), (e).  In

contrast, BLM is specifically authorized by the statute to manage horse populations by sterilizing

individual horses — a process that must certainly involve capturing horses, taking them

temporarily from their habitats, and then returning them after sterilization is complete.  See id.

§ 1333(b).  That process is not deemed a "removal" by the statute, and the fact that the statute

permits it indicates that Congress contemplated and approved the possibility that healthy horses

might be taken from their range temporarily and then released back into it as part of BLM's

efforts at population control.

   Thus, by capturing or rounding up ninety percent of the Complex's horses all at

once and gathering them together in a nearby holding facility for sorting, BLM is not

"removing" all of those horses simultaneously.  Rather, horses are permanently separated from

the range, and therefore "removed," only once BLM decides that they will not be returned —

---

[5] The Court noted at oral argument that Congress failed to expressly define any of the terms relevant to the parties' arguments — "remove," "gather," "corral," "capture," or "round up."  See Trans. at 17, 25.

that they will instead be euthanized or transported for adoption or long-term holding.

Furthermore, contrary to the plaintiffs' contentions, nothing in the statute requires that

destruction of aged or ill horses occur "on the range."  Plaintiffs reach this conclusion because,

while the statute specifies that healthy, adoptable horses may be "captured and removed" from

an area, it merely says that "old, sick, or lame animals" will "be destroyed."  Reply at 4.  But the

statute's explicit authorization of the capture and removal of healthy horses and its silence

regarding the capture of unhealthy horses do not amount to an explicit prohibition of the latter

action.  "Silence . . . may signal permission rather than proscription.  For that reason, that

Congress spoke in one place but remained silent in another . . . rarely if ever suffices for the

direct answer that <u>Chevron</u> step one requires."  <u>Catawba County, N.C. v. EPA</u>, 571 F.3d 20, 36

(D.C. Cir. 2009) (citations and internal quotation marks omitted).  On the contrary, as the D.C.

Circuit has explained, such silence is routinely interpreted as a sign that Congress has left a

"question to agency discretion."  <u>Id</u>.  (citation and internal quotation marks omitted).[6]

The plaintiffs' interpretation of the Wild Horse Act is also unpersuasive as a

matter of logic.  Under the plaintiffs' reading, no healthy horse may be captured before all old or

infirm horses are destroyed.  This interpretation creates an impossible Catch-22 for the agency:

To evaluate the age and health of a horse, a veterinarian must presumably be close to it for a

significant period of time.  A wild horse is unlikely to submit to such an inspection voluntarily; it

---

[6]    The legislative history cited by the plaintiffs is not to the contrary.  Plaintiffs quote the
following statement from the House report accompanying the 1978 amendments to the Wild
Horse Act as evidence that the statute requires the identification and destruction of aged or ill
horses while they roam free on the range: "[O]ld, sick, or lame animals are to be destroyed in the
most humane manner possible.  Presumably this will entail culling of herds on the range."  H.R.
REP. NO. 95-1122 (1978).  The latter sentence, however, constitutes mere speculation as to how
the agency will interpret the statute — not an instruction that must be followed.

would have to be restrained or, more likely, confined — in other words, captured.  But if, as the plaintiffs contend, BLM cannot capture a healthy horse before euthanizing all unhealthy ones, and cannot determine whether a horse is healthy or unhealthy without capturing it, the agency cannot begin the removal process, despite its statutory mandate to do so.  A statute should not be construed to produce absurd results.  Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 5 (2000).  As a result, the Wild Horse Act cannot logically be read to forbid the capture of healthy horses prior to the euthanization of unhealthy ones.

The Court rejects as unpersuasive the plaintiffs' claim that BLM's method of conducting the removal process described by 16 U.S.C. § 1333(b)(2) violates the clear intent of Congress as expressed in the statute.  The plaintiffs have not argued that the Court should set aside the gather plan at step two of the Chevron analysis.[7]  The Court therefore concludes that the plaintiffs have not demonstrated a substantial likelihood of success on the merits of this claim.

2.  Other Preliminary Injunction Factors

The other three factors to be considered on a motion for preliminary injunction — the injury that the plaintiffs will suffer in the absence of an injunction, the balance of harms, and the public interest — do not compensate for the plaintiffs' weak showing on the merits.  The plaintiffs argue that if the gather is conducted in the manner that BLM proposes, "thousands of non-excess horses" will be removed from the range, depriving plaintiffs Mr. Downer and Ms. Farley of the opportunity to observe and study them.  Reply at 11.  That injury — assuming for the sake of argument that it is irreparable — must be weighed against the substantial harm to

---

[7]     In any case, under Chevron step two the Court would be inclined to defer to the expert agency, BLM, with regard to its reading of the statute.

13

other interests that likely would result if the Court were to enjoin the proposed gather.

According to BLM, winter is the best time to gather horses in the Calico Mountains Complex

because "fewer injuries to hooves and legs occur during winter gathers in this area." EA at 55.

Road and terrain conditions in spring and summer make gathers conducted during those months

difficult and potentially dangerous. EA at 55-56; Opp., Ex. D (Declaration of Gene Seidlitz)

¶ 29. As a result, if an injunction forces the agency to carry out its gather at a substantially later

date, injuries to the horses may result. Opp. at 20.

At the same time, the Wild Horse Act embodies the policy that the public interest

is served by careful management of wild horses to prevent overpopulation. See 16 U.S.C.

§ 1333. If the proposed gather is delayed, the already excessive wild horse population in the

Complex will grow further, possibly resulting in damage to the range as the horses compete for

resources with other species and among themselves, see EA at 53, and ultimately requiring the

removal of even more horses at a later date. In light of the substantial problems that would arise

if a preliminary injunction were granted, and the weakness of plaintiffs' claim on the merits, the

Court will deny that part of the plaintiffs' motion that requests an injunction based on the alleged

illegality of the proposed roundup.

### B.  Placement of Excess Horses in Long-Term Holding Facilities

The plaintiffs also challenge the legality of the proposed gather plan because

BLM intends to transport healthy "excess" horses that are not adopted or sold to "BLM facilities

for . . . long-term holding" outside Nevada, in Kansas, Oklahoma, or South Dakota. EA at 12.

This contention, independent of the plaintiffs' claim concerning the order in which BLM will

capture and remove excess horses, requires a separate analysis of the Wild Horse Act and the

preliminary injunction factors.

### 1.  The Merits

Section 1333(b)(2) of the Wild Horse Act instructs BLM that excess horses

"shall" be removed by the following means and in the following "order and priority": the

destruction of old or sick horses, the adoption of as many healthy horses as possible, and the

destruction of any remaining healthy horses "in the most humane and cost efficient manner

possible."  16 U.S.C. § 1333(b)(2)(A)-(C).  The last of those three actions is not presented by the

statute as optional; the statute directs that, after unhealthy horses have been euthanized and

healthy horses have been offered for adoption, the agency "*shall* cause additional excess wild

free-roaming horses . . . for which an adoption demand by qualified individuals does not exist to

be destroyed in the most humane and cost efficient manner possible."  Id. § 1333(b)(2)(C)

(emphasis added).  In 2004, Congress amended the statute to provide that unadopted excess

horses could also be sold: "Any excess animal . . . *shall* be sold if . . . the excess animal is more

than 10 years of age; or . . . the excess animal has been offered unsuccessfully for adoption at

least 3 times."  Id. § 1333(e)(1) (emphasis added).  The statute thus contains two directives that

instruct BLM regarding the disposition of healthy excess horses that are not adopted.  It contains

no general language granting BLM discretion to opt for alternate means of dealing with excess,

unadoptable animals.

Nevertheless, pursuant to its gather plan, BLM will not humanely euthanize

excess horses from the Complex that are not adopted or sold.  Instead, it will transport them to

BLM facilities in Oklahoma, Kansas, or South Dakota for "long-term holding," during which the

horses will presumably be under the care of BLM.  EA at 12.  The plaintiffs protest that the Wild

Horse Act clearly does not permit such long-term holding of horses by BLM, and the Court finds

that argument persuasive.

While the Act contains no general language providing BLM the discretion to

choose the ultimate disposition of excess horses that cannot be sold or adopted, it does include

this explicit prohibition: "Nothing in this chapter shall be construed to authorize [the agency] to

relocate wild free-roaming horses or burros to areas of the public lands where they do not

presently exist."  16 U.S.C. § 1339.  BLM does not contend that its long-term holding facilities

are located in areas where wild horses have historically existed, or that its movement of the

horses from Nevada to Oklahoma, Kansas, and/or South Dakota does not constitute a relocation.

While the term "relocate" is not defined in the statute, in common parlance "relocate" means to

"establish or lay out in a new place," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1919

(1993), a definition which fits to a tee what defendants propose to do with a large number of the

wild horses.[8]  As a result, BLM's relocation of excess horses to those facilities for indefinite

holding periods violates the plain language of Section 1339.

Furthermore, BLM's use of long-term holding facilities runs counter to the

statute's mandate that the agency's management of wild horses occur at "the minimal feasible

level."  16 U.S.C. § 1333(a).  Long-term maintenance of thousands of horses in holding pens

constitutes intensive management that was not contemplated by Congress when the Wild Horse

Act was passed.  As the Senate Report noted:

_____

[8]     See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101,109 n.5 (2002) ("In the absence
of an indication to the contrary, words in a statute are assumed to bear their ordinary,
contemporary, common meaning." (citation and internal quotation marks omitted)).

> [T]he management of the wild free-roaming horses and burros
> [should] be kept to a minimum both from the aspect of reducing
> costs of such a program as well as to deter the possibility of "zoo-
> like" developments.  An intensive management program of
> bre[e]ding, branding, and physical care would destroy the very
> concept that this legislation seeks to preserve.  A recurrent theme
> in testimony by witnesses before the committee advocates, in
> effect, leaving the animals alone to fend for themselves.

S. REP. NO. 92-242, at 3 (1971) (commentary on Pub. L. No. 92-195).  While BLM presumably

neither breeds nor brands the horses in its long-term holding facilities, it does provide physical

care for them, at a very high cost — their removal, relocation, and maintenance consumes

approximately three-quarters of the agency's annual budget for its horse and burro program.

Trans. at 30.  BLM also estimates that the number of horses currently maintained in long-term

holding facilities has reached more than 30,000.  Trans. at 29.  Such a large number of confined

horses raises precisely the specter of the "'zoo-like developments'" whose formation the Act was

meant to prevent.

BLM's proposed confinement of hundreds or thousands of horses from the Calico

Mountains Complex in long-term holding facilities in other states thus appears to contravene the

unambiguous intent of Congress as expressed in statutory text and legislative history.  It

therefore is likely that the agency's interpretation of the statute as permitting such long-term

holding and maintenance must be rejected at step one of the Chevron analysis.

The Court says that BLM's interpretation is *likely* to be impermissible under the

Chevron analysis because it would be premature to reach a firm conclusion on this issue at this

time.  The defendants have argued, and the Court agrees, that the possible illegality of long-term

holding was not presented as a ground for issuance of a preliminary injunction in this matter

until the plaintiffs raised it in their reply brief.  See Defs. Resp.. at 3.   As the plaintiffs note,

17

Count Two of their original complaint does allege that "[c]apturing, corralling and placing [horses] in long term holding pens is not contemplated by the WFHBA and its associated regulations and is illegal." Compl. ¶ 54. The complaint does not expand further on that argument, however, and the plaintiffs did not cite that claim or make that argument in their motion for a preliminary injunction. As a result, the defendants did not have the opportunity to address the argument in their opposition brief and discussed it only briefly at oral argument. See Trans. at 30-34. The Court is reluctant to opine with any degree of certainty on the merits in reliance upon such a record. As the D.C. Circuit has emphasized:

> [T]he premise of our adversarial system is that . . . courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them. Considering an argument advanced for the first time in a reply brief, then, . . . entails the risk of an improvident or ill-advised opinion on the legal issues tendered.

McBride v. Merrell Dow & Pharmaceuticals, Inc., 800 F.2d 1208, 1211 (D.C. Cir. 1986).

The Court's consideration of the merits of this claim is further complicated by the unusual, perhaps unique, treatment of the Wild Horse Act by Congress. Thus far, the defendants have not claimed that any particular provision of the Wild Horse Act gives BLM the authority to confine excess horses for long periods of time in lieu of euthanizing them. Instead, they have relied entirely on an extra-statutory authority: congressional appropriations bills. For at least the past twenty years, Congress has included in many of its bills authorizing appropriations for the Department of the Interior an express statement that BLM may not use any funds for the destruction of healthy horses. See, e.g., Consolidated Appropriations Resolution, Pub. L. No. 108-7, 117 Stat. 11, 217 (2003); Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, 1321-156; Pub. L. No. 100-446, 102 Stat. 1774, 1774

(1988).  For the 2010 fiscal year, Congress has provided that appropriations for the Department

of the Interior "shall not be available for the destruction of healthy, unadopted, wild horses and

burros in the care of the Bureau of Land Management or its contractors or for the sale of wild

horses and burros that results in their destruction for processing into commercial products."  Pub.

L. No. 111-88, 123 Stat. 2904, 2907 (2009).

　　　　　None of these appropriations bills, it should be noted, expressly acknowledges

BLM's practice of confining and maintaining large numbers of horses for long periods of time,

or specifically allocates funds to be used for that purpose.  But according to the defendants,

Congress' repeated denial of funds for the purpose of euthanizing excess healthy horses in

accordance with 16 U.S.C. § 1333(b)(2)(C) constitutes implicit acknowledgment and approval of

the fact that BLM routinely places unadopted, unsold horses into long-term holding facilities

instead of destroying them.  Defs. Resp. at 2; Trans. at 30.  If that were not the case, defendants

say, Congress would be placing BLM in an untenable position: the Wild Horse Act clearly

requires the agency to remove wild horses from the West "immediately" once BLM determines

that an overpopulation exists, see 16 U.S.C. § 1333(b)(2), but if BLM can neither euthanize

unadopted horses nor hold them for long periods, it has no realistic option for removing them

from their ranges.  Trans. at 28-29.  And the legislative history for the most recent appropriations

bill does indeed suggest that the Senate Appropriations Committee, at least, acknowledges the

fact of long-term holding:

> The Committee recognizes the need for a substantial budget
> increase of $26,873,000 for the [BLM's] wild horse and burro
> program in 2010 and provides the requested level of $67,486,000.
> However, the Committee notes that the costs for gathering and
> holding equines to control populations on public lands have risen
> beyond sustainable levels.  The Committee directs the Bureau to
> (1) consider private proposals for long-term care of wild horses

19

> and burros; (2) create a bidding process among such proposals, and
> (3) prepare and publish a new comprehensive long-term plan and
> policy for management of wild horses and burros that involves
> consideration and development of proposals by non-governmental
> entities, by September 30, 2010.

S. REP. NO. 111-38, at 11 (2009).  The Committee's acknowledgment of the vast sums of money

spent by BLM on "gathering and holding equines" and its instruction that the agency consider

transferring responsibility for "long-term care of wild horses" to private entities indicates that

Congress is aware of and acquiesces in BLM's practice of placing excess, unadopted horses in

long-term holding facilities.

> At the same time, while the legislative history indicates congressional sanction of

BLM's practices, the 2010 appropriations bill itself does not.  The bill contains specific language

that expressly prohibits BLM from using its funds to destroy healthy horses, but it does not

mention, much less authorize, long-term holding.  While "Congress may ratify [otherwise

unauthorized] agency action through appropriation acts,"  Fund for Animals v. United States

Bureau of Land Management, 460 F.3d 13, 19 n.7 (D.C. Cir. 2006) (citation and internal

quotation marks omitted), it may do so only by clearly identifying the action to be ratified.  "The

appropriation must plainly show a purpose to bestow the *precise* authority which is claimed."

Schism v. United States, 316 F.3d 1259, 1289 (Fed. Cir. 2002) (citing Ex parte Endo, 323 U.S.

283, 303 n.24 (1944)) (internal quotation marks omitted; emphasis in original); *accord* Fund for

Animals v. United States Bureau of Land Management, 460 F.3d at 19 n.7 ("hesitat[ing] to read

too much into" an appropriations act where the act did not identify the program allegedly ratified

"as a line item").

> Because Congress has never, to the Court's knowledge, stated in an

appropriations act that BLM is authorized to use funds for the long-term holding of wild horses,

BLM cannot derive any legal authority to engage in that practice from the statutes that appropriate funds for the agency.  Thus, with regard to this line of argument as with the <u>Chevron</u> analysis, the plaintiffs have established a substantial likelihood of success on the merits of its claim that relocating excess horses to long-term facilities is not authorized by law.  Again, however, the Court must emphasize the possibility that, once given the opportunity to brief this issue, the defendants may be able to present more convincing arguments in favor of their position.

### 2.  Irreparable Injury

"Plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."  <u>Winter v. Natural Resources Defense Council, Inc.</u>, 129 S. Ct. 365, 375 (2008) (emphasis in original).  And the D.C. Circuit has "set a high standard for irreparable injury."  <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d at 297.  "[T]he injury must be both certain and great; it must be actual and not theoretical."  <u>Id</u>. (citing <u>Wisc. Gas Co. v. Fed'l Energy Regulatory Comm'n</u>, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Furthermore, the injury must be "of such *imminence* that there is a clear and present need for equitable relief."  <u>Id</u>. (citation and internal quotation marks omitted; emphasis in original).  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation[,] weighs heavily against a claim of irreparable harm."  <u>Id</u>. at 297-98 (citation and internal quotation marks omitted).

The plaintiffs have made the same broad claims of injury with regard to both of their claims on the merits: they argue that implementation of the proposed gather plan will greatly reduce the number of horses available for Mr. Downer's study and observation, <u>see</u>

21

Mem. at 11, and will alter existing "herd dynamics and mentalities" by separating so many individual horses from their herds.  Reply at 11.  The most obvious problem with this argument is that a preliminary injunction against the long-term holding of horses will not cure the asserted injury.  As has already been explained, the Court will not enjoin BLM from conducting the proposed gather beginning on December 28, 2009.  BLM will be permitted to capture up to ninety percent of the horses currently living in the Calico Mountains Complex and place them in temporary holding facilities.  Even if BLM is enjoined from placing any horses in *long-term* holding facilities outside the state of Nevada, the agency still will be entitled to take those horses from the range for some undefined period in the *short-term*.  In view of the Court's ruling on the plaintiffs' first argument on the merits, the number of horses on the range will be reduced for some period of time whether an injunction barring long-term holding is granted or not.  As a result, the plaintiffs have failed to allege an imminent and tangible irreparable injury that would warrant the issuance of an injunction at this stage of the litigation.  See Chaplaincy of Full Gospel Churches v. England, 454 F.3d at 297-98.[9]

3.  Remaining Factors

The remaining factors to be considered — the potential harm to defendants or other interested parties that would result from the issuance of an injunction, and the extent to which the public interest would be served or adversely affected by injunctive relief — weigh against issuance of an injunction.  If the injunction is granted, BLM will be placed in an

---

[9]     The defendants have raised the possibility that the plaintiffs' asserted injury — the reduction in the number of horses available for viewing — is not sufficient to confer standing to bring the claims in question.  See Trans. at 40.  Because the defendants have not filed a motion to dismiss based on this contention, and the issue has not been briefed, the Court will not discuss it further here.

impossible situation.  If the agency conducts the proposed gather as planned, with the understanding that long-term holding of horses will not be permitted, BLM will have to decide what to do with excess horses that are not adopted or sold soon after they are captured.  The Wild Horse Act provides no authority for the agency to release excess horses back onto the range; in fact, given the statute's mandate that removal of those horses occur "immediately," the statute may fairly be read to prohibit such a release.  But since the agency has no funds to euthanize those horses and would be enjoined from holding them, it would face an inescapable conundrum.

In the face of such a dilemma, the agency's best option might be to postpone the gather — but that is a decision for the agency charged with implementing the dictates of the Wild Horse Act, not this Court.[10]  Furthermore, such a postponement might result in the gather not being performed until mid-2010, after the peak of spring foaling season has passed.  See EA at 54.  At that point, the problem of horse overpopulation in the Calico Mountains Complex will have worsened, making the task of removal more expensive for the agency and necessitating the capture of a larger number of horses, always at a risk, however small, to their safety.

The risk of these harms to the agency and to the horses themselves counsels against the grant of preliminary relief.  So, too, does the public interest.  Congress, through the Wild Horse Act and its apparent acquiescence, however unofficial, in BLM's transport of excess horses for long-term holding in Oklahoma, Kansas, or South Dakota, has suggested that the

---

[10]     It is also possible that Congress soon may enact a more nuanced solution to this problem than this Court can offer.  Under a bill already passed by the House and now under consideration in the Senate, the Wild Horse Act would be amended to expressly permit the relocation of horses to new areas of the public lands.  See H.R. 1018, 111th Cong. § 5(b)(1) (2009).  The bill would also prevent BLM from confining horses "in corrals or short-term holding facilities for more than 6 months."  Id. § 5(d).

public interest is served when excess horses are taken off the range.  Issuance of an injunction at this stage might lead to substantial growth in the already overpopulated herds residing in the Complex.  When the merits of the case are as yet uncertain, it would be imprudent to grant the plaintiffs' relief that would produce such perverse results.

## IV.  CONCLUSION

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Resources Defense Council, Inc., 129 S. Ct. at 376.  Plaintiffs have failed to make that showing with regard to either of their claims for relief.  Their first claim — asserting that the gather plan proposed by BLM departs from the removal procedure mandated by 16 U.S.C. § 1333(b)(2) — is unlikely to succeed on the merits because it is based on a misreading of the statute and congressional intent.  The second claim — that BLM does not have the authority to keep excess horses for long-term holding — has a much greater chance of success, but in light of the defendants' lack of an opportunity to respond fully to that claim, plaintiffs' failure to establish imminent irreparable injury, and the harms to interested parties and the public interest that would result from issuance of preliminary injunctive relief, the Court declines to issue an injunction based on that claim at this time.

BLM estimates that the proposed gather will last approximately fifty to sixty days.  EA at 1.  Presumably, at the end of that period, the agency will have to make firm decisions regarding the transport of some excess horses for long-term holding.  The Court would be receptive to an effort by the parties to resolve some of the many outstanding questions in this

matter on an expedited basis, or to agree upon an expedited briefing schedule for dispositive motions, before that sixty day period has concluded.

For the foregoing reasons, the plaintiffs' motion for a preliminary injunction is DENIED.  An Order consistent with this Opinion shall issue this same day.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:   December 23, 2009