UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS
3010 Kerner Blvd.
San Rafael, CA 94901

CRAIG C. DOWNER
944 Vassar Street
Carson City, NV 89705

TERRI FARLEY
235 Bridge Street
Verdi, NV 89439

v.

KEN SALAZAR,
in his official capacity as Secretary,
United States Department of Interior
1849 C Street, N.W.
Washington, D.C. 20240

ROBERT ABBEY,
in his official capacity as Director,
Bureau of Land Management
1849 C Street, N.W.
Washington, D.C. 20240

DAVE HAYS,
in his official capacity as
Field Manager,
Bureau of Land Management
Black Rock Field Office
5100 East Winnemucca Blvd.
Winnemucca, NV 89445

JEROME FOX,
in his official capacity as
Wild Horse and Burro Specialist,
Bureau of Land Management
Winnemucca District Office
5100 East Winnemucca Blvd.
Winnemucca, NV 89445

Civil Action No. 09-2222 (PLF)
SECOND AMENDED COMPLAINT

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This action concerns the wild horse herds living in the five Herd Management

Areas ("HMAs") of the Calico Mountains Complex in northwest Nevada.  These horses

currently and lawfully occupy public lands within the Bureau of Land Management's ("BLM")

Winnemucca District Area ("WDA") and are protected under the Wild Free-Roaming Horses

and Burros Act ("WFHBA"), 16 U.S.C. §§ 1331 *et seq.*  The WFHBA protects wild horses from

harassment, commercial exploitation, and death.  These herds are managed and protected by the

Winnemucca District Office ("WDO") of BLM.

2.      BLM published its Preliminary Environmental Assessment (DOI-BLM-NV-

W030-2010-0001-EA) ("EA") for the Calico Mountains Complex Wild Horse Capture Plan on

October 23, 2009.  Exhibit 1, attached.  The final EA is typically released immediately prior to

the roundup.

3.      Plaintiffs filed their Verified Complaint for Declaratory and Injunctive Relief on

November 23, 2009, based upon information and belief that the final EA and commencement of

the roundup were imminent.  Specifically, at that time, the capture of these wild, free-roaming

horses was to begin directly on December 1, 2009, and continue on through the harsh winter

months, until 2,476 to 2,523 wild horses (80 to 90% of the current estimated total population of

3,095) were removed from this area.

4.      Upon learning of this lawsuit, Defendants elected to postpone the gather at issue

to December 28, 2009, and indicated that the final EA would be issued on December 1, 2009.

5.      Given this information, Plaintiffs chose to proceed with the filing of their Motion

for Injunctive Relief on November 25, 2009, alleging that the proposed "gather plan"

contemplates an illegal roundup and capture of the wild horses in violation of the WFHBA and its applicable regulations. BLM plans to utilize helicopters to indiscriminately chase virtually every wild horse located in the WDA into holding pens, corralling the animals for an indeterminate amount of time.

6.      Following a one-week delay, the final EA was finally issued on December 8, 2009. Exhibit 2, attached. Counsel for Defendants provided a copy to Plaintiffs on December 10, 2009, the same day as the filing of their opposition brief.

7.      Though there were significant changes between the Preliminary and final EA, BLM's overall plan remains the same - the indiscriminate roundup of hundreds of horses, leading to their indefinite imprisonment in long-term holding facilities. BLM's final plan violates the WFHBA and its applicable regulations in the same ways contemplated by the Preliminary EA.

8.      The planned gather of the horses is slated to begin December 28, 2009, and to continue for 50 to 60 days until complete. The wild horses will be temporarily corralled in short-term holding facilities until they are sorted; a portion will be re-released into the Calico Mountains Complex while the rest of the horses will be transported to long-term holding facilities outside of Nevada and the horses' current location.

9.      BLM has not determined which horses are in excess according to the prescribed categories authorized by Congress in the WFHBA before it begins its proposed gather. It intends to roundup virtually all the horses located in the WDA, remove them from their habitat, and warehouse them for later determination of which animals are excess. Then BLM intends to release the remainder back into their habitat. Gathers conducted in this manner are dangerous and inhumane to the animals being captured, and cause injury or death to a number of these wild horses. This is not the intention of Congress. Unless this Court enters an order for declaratory

judgment it is likely that BLM will proceed with its illegal and inhumane roundup of the wild

horses in the Calico Mountains Complex.  Because BLM's challenged actions are contrary to

law and will result in irreparable injury to Plaintiffs, Plaintiffs are seeking declaratory and

injunctive relief.

## JURISDICTION AND VENUE

10.     This case concerns a federal question and, therefore, jurisdiction is proper under

28 U.S.C. § 1331.  Venue is also proper under 28 U.S.C. § 1391(e).  This Court may review

defendants' actions and order appropriate relief under the Administrative Procedure Act, 5

U.S.C. §§ 701 *et seq.*

## PLAINTIFFS

11.     Mr. Craig C. Downer is a fourth generation Nevadan with significant ties to the

Nevada equine community.  As a descendant of the Nevada pioneers, Mr. Downer was raised

among the mustangs and has loved and appreciated them his entire life.  He has visited herds

throughout the state, including the Calico Mountains Complex.  Mr. Downer holds an

undergraduate degree in Biology: Plan Ecology from University of California, Berkeley.  In

addition, Mr. Downer has a Masters of Science degree in Biology – specializing in wildlife

ecology – from the University of Nevada, Reno.  Following receipt of his degrees, Mr. Downer

served in the Peace Corps as a wildlife ecologist.  In addition to several journal publications, Mr.

Downer is the author of a published book titled "Wild Horses: Living Symbols of Freedom," and

is a frequent lecturer on wild horses and burros.  Mr. Downer has a personal interest in viewing

and enjoying the wild horses in the Calico Mountains Complex.  Having lived and worked in the

area for many years, he is familiar with the herds of the Calico Mountains.  In October 2009 Mr.

Downer toured the Calico Mountains Complex via a 4WD Dodge Durango, witnessing the

4

beauty of the wild horses at issue in this matter.  He noted that the bands were widely and sparsely distributed and largely appeared to be in good health.  Within the next few days, Mr. Downer also plans to fly over the area to continue his review of the herd, weather permitting.

12.    In September 2006 Mr. Downer witnessed the roundup of other wild horses removed from the range.  He saw firsthand the horses' reactions to their loss of freedom, and the stunning physical impact of their removal, including significant injuries and in some instances, even death.  Following the roundup, Mr. Downer participated in an investigation of the injustices against wild horses in the West, particularly the Calico Mountains Complex.  He returned to the site of the roundup and found evidence of significant mistakes made by BLM.  Mr. Downer also witnessed a roundup of other wild horses from the High Rock Herd Management Area ("HMA") adjacent to the Calico Mountain HMA.  Mr. Downer has memories of this roundup and he fears for the safety and well being of any wild horses BLM intends to capture, particularly those included in the planned December 28, 2009 roundup.  If the proposed roundup does indeed proceed as planned, Mr. Downer will attend and witness BLM's actions.

13.    Mr. Downer undertook an aerial tour of the Calico Mountains Complex on December 9, 2009, in order to observe the wild horses in their natural habitat.  During this tour, he only observed 28 separate wild horse bands and only 150 individual horses, although the tour encompassed all five HMAs located within the Complex.  The horses Mr. Downer observed during this recent tour all appeared to be in excellent physical health.

14.    Mr. Downer will continue to visit the few remaining horses of the Calico Mountains following BLM's Roundup.  However, the horses he visits will be virtually unrecognizable, as the planned gather will decimate the herds while destroying the social structure among the horses.

15.     In Defense of Animals ("IDA") is a California non-profit corporation established in 1983.  IDA is dedicated to the mission of ending animal exploitation, cruelty, and abuse by protecting and advocating for the rights, welfare, and habitats of animals, as well as to raise their status beyond mere property, commodities, or things.  IDA brings this suit on behalf of its constituents, who are interested in and affected by the BLM activities at the Calico Mountain Complex, and specifically the wild horses in this region.  IDA supporters visit and enjoy viewing these wild horses living on public lands.  IDA has participated in the BLM environmental review, submitting comments to BLM's Preliminary Environmental Assessment of the Calico Mountains Complex - Wild Horse Capture Plan.  IDA also requested an extension of the public comment period to allow for more public participation in this important decision.  On November 22, 2009, IDA filed a complaint alleging National Environmental Policy Act violations regarding the proposed Calico roundup with the Council on Environmental Quality and demanding a stop to the proposed roundup.  IDA has more than a thousand supporters and donors located within the state of Nevada.

16.     Terri Farley is a well respected journalist and author who has written extensively about wild horses, particularly the wild horses of the Calico Range.  Ms. Farley is the author of the *Phantom Stallion* book series for young readers, a wildly popular series set in the Calico Mountain Complex in Nevada.  Ms. Farley is also the co-author of a "Wild Horse Adventure of Nevada" brochure, produced in conjunction with the Wild Horse Preservation League and the Nevada Department of Tourism.  Ms. Farley's interest in wild horses also extends beyond her professional writing to include a personal interest in their well-being, as evidenced by 8 years of volunteer work with the Wild Horse Sanctuary in Shingletown, CA and participation in BLM's

Girl Scout and school education programs. Thus, Ms. Farley has visited the range to view the horses for both her personal aesthetic enjoyment and her professional writing interests.

17.     Ms. Farley has spent a considerable amount of time observing wild horses both at BLM holding facilities and on the range while researching her non-fiction articles and *Phantom Stallion* novels. She has visited the Calico Mountain complex a minimum of four times and was an eyewitness to the stress and abuses of two of BLM's previous Calico Mountain roundups in 2001 and 2002.

18.     Ms. Farley will attend and witness the challenged roundup should it proceed as planned. Ms. Farley contends that following the roundup, remnants of the herds will be scattered and difficult to observe, and many bands may disappear. Having previously witnessed similar roundups, Ms. Farley knows that the aesthetic enjoyment she shares with her readers will be destroyed if the roundup is executed.

## DEFENDANTS

19.     Mr. Ken Salazar is the Secretary of the Department of Interior ("DOI"). Pursuant to the WFHBA, Mr. Salazar is responsible for the oversight of BLM's management of wild horses on the Nation's public lands, including the public lands of Nevada.

20.     Mr. Robert Abbey is the Acting Director of the BLM and is responsible for implementing management decisions for wild horses in accordance with the WFHBA.

21.     Mr. Dave Hays is the Field Manager for the WDO and is responsible for managing the wild horses of the five HMAs located in the Calico Mountains Complex in compliance with the WFHBA and its implementing regulations.

22.    Mr. Jerome Fox is a Wild Horse and Burro Specialist in BLM's WDO, and was the lead author of the BLM's Calico Mountains Complex Preliminary and Final EAs, challenged herein.

## STATUTORY AND REGULATORY BACKGROUND
## GIVING RISE TO PLAINTIFFS' CAUSES OF ACTION

### I. The Wild Free-Roaming Horses and Burros Act

23.    Through the WFHBA, Congress found and declared that, "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." Upon finding this, Congress stated that its policy was that "wild free-roaming horses and burros shall be *protected from capture, branding, harassment, or death*; and to accomplish this they are to be *considered in the area where presently found*, as an integral part of the natural system of public lands." 16 U.S.C. § 1331 (emphasis added).

24.    BLM and the U.S. Forest Service ("USFS") have exclusive authority under the WFHBA for the protection of wild horses and burros on the public lands administered by those agencies. 16 U.S.C. § 1332(a), (e). The WFHBA requires that BLM's and USFS's management activities be at "the minimal feasible level." *Id*. According to BLM's own regulations, BLM must protect wild horses and burros from unauthorized capture, branding, harassment, or death and provide these animals with humane care and treatment. 43 C.F.R. § 4700. The Act requires the Secretary to "protect and manage wild free-roaming horses and burros as components of the public lands . . . . The Secretary shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). The Act provides that, "[t]he Secretary shall maintain a current

inventory of wild free-roaming horses and burros on given areas of the public lands." Under the Act, "appropriate management levels" or "AMLs" of wild horses are to be based on a current inventory of wild horses and on the basis of ecological balance, which cannot arbitrarily be fixed at a moment in time. This inventory is to be the basis for "determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels . . . determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)." 16 U.S.C. § 1333(b)(1). The Act also provides that, "[w]here the Secretary determines . . . that an overpopulation exists on a given area of the public lands and that action is necessary to remove excess animals, he shall immediately remove excess animals from the range so as to achieve appropriate management levels." 16 U.S.C. § 1333(b)(2). However, "Nothing in this chapter shall be construed to authorize the Secretary to relocate wild free-roaming horses or burros to areas of the public lands where they do not presently exist." 16 U.S.C. § 1339.

25.     In the Committee report accompanying the bill that became law, the Senate Committee noted, "The committee wishes to emphasize that the management of the wild free-roaming horses and burros be kept to a minimum both from the aspect of reducing costs of such a program as well as to deter the possibility of 'zoo like' developments." S. Rep. 92-242, 92nd Cong., 1st Sess. 1971 at 2152. "An intensive management program of breeding, branding, and physical care would destroy the very concept that this legislation seeks to preserve . . . leaving the animals alone to fend for themselves and placing primary emphasis on protecting the animals from continued slaughter and harassment by man." *Id*.

**II. National Environmental Policy Act**

26.     Under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq., any major federal action that significantly affects the quality of the human environment requires the preparation of an EIS. NEPA §102(2)(C). The language and spirit of NEPA is aimed at ensuring that an agency's single-minded approach to a proposed action is tempered by consideration of a reasonable range of alternatives, including those with fewer adverse environmental impacts than the proposed action.

27.     Agencies may decide instead of preparing an EIS, to prepare an EA first. An EA serves three purposes: 1) it assists in agency decision-making on whether to prepare an EIS or Finding of No Significant Impact ("FONSI"); 2) it independently ensures compliance with NEPA even when no EIS is required; and 3) it facilitates the preparation of an EIS if one is required. 40 C.F.R. § 1508.9(a).

28.     NEPA requires BLM to analyze in an EA alternatives which involve unresolved conflicts concerning alternative uses of available resources even when an EIS is not required. NEPA § 102(2)(C)(iii).

29.     Although an EA is a "concise public document," it must include a discussion of the need for the proposal, alternatives, environmental impacts of the proposed action and the alternatives and a listing of the persons and agencies consulted. 40 C.F.R. §§ 1508.9(a), 1508.9(b).

30.     An EA's FONSI is only considered adequate if the agency took a "hard look" at the problem, the agency identified the relevant areas of environmental concern, the agency made a convincing case that the environmental impacts were insignificant as to the problems studied and identified; and if there were significant impacts, the agency convincingly established changes that reduced the impacts to a minimum.

10

31.     The Council on Environmental Quality ("CEQ"), the agency responsible for implementing NEPA, and BLM's regulations under NEPA, requires that BLM analyze the direct, indirect and cumulative impacts on the environment under the proposed action and each alternative to determine if the impacts are significant.  BLM's regulations require that this analysis be based on the best available information and should be objective, i.e., should not reflect subjective value judgments.

32.     An EA may contain mitigation measures to avoid significant impacts that would otherwise require the preparation of an EIS.  BLM regulations require that an EA must identify and analyze mitigation measures which may be taken to avoid or reduce environmental harm.

33.     An EA serves an important statutory purpose beyond being an initial step toward the preparation of an EIS or a FONSI.  Independent of this requirement, an EA must discuss, in adequate detail, a reasonable range of alternatives.

34.     An agency must take a "hard look" at the alternatives and the environmental impacts of each.  An agency must consider a full range of alternatives that cover a full spectrum of possibilities and demonstrate reasoned decision-making.  It must also give a reasoned explanation for rejecting each alternative.

35.     BLM regulations also require that a No-Action alternative be analyzed at the same level of detail as the proposed action.

## FACTS

### BLM'S PLANNED ROUNDUP OF THE WILD HORSES LOCATED IN THE CALICO MOUNTAINS COMPLEX

#### I. The final EA Outlining the Calico Mountains Complex Gather Plan

36.     The Calico Mountain Complex comprises a total of about 542,100 acres and is located north and east of Gerlach, in northwest Nevada within Humboldt and Washoe counties.

The Calico Mountains Complex includes five Herd Management Areas (HMAs): Black Rock Range East; Black Rock Range West; Calico Mountains; Granite Range; and Warm Springs Canyon.

37.     The final EA contemplates the proposed capture of 2,432 to 2,736 wild horses; the release of up to 268 of those captured horses; and the removal of 2,432 to 2,468 "excess" wild horses. This plan will leave behind decimated herds, with only 572 to 952 total wild, free-roaming horses remaining within the entire 542,100 acre Calico Mountain Complex. Ex. 2 at 1, 13.

38.     The proposed gather is scheduled to begin December 28, 2009, and is expected to take about three months for completion.

39.     Ironically, the final EA specifically reviews and dismisses the only legal and appropriate approach for culling the Calico Mountains herds to return the population to the desired management level. Ex. 2 at 18. BLM correctly lays out each step of the tiered gather approach, and then dismisses it as impractical or impossible due to the size of the Complex and costs. *Id*. This brazen defiance of the requirements of the WFHBA shows BLM's lack of regard for the goals and tenets of the Act and the will of Congress.

40.     Under the final EA, up to 90% of the current horse population will be gathered on the range, with excess horses then being transported to BLM facilities for adoption, sale, or the most likely scenario, long-term holding. Ex. 2 at 12. This long-tem holding under "zoo-like" conditions divests the horses of their statutory protections and defeats Congress' purpose of protecting them as free-roaming wild animals; moreover, it is certainly not a "minimal level of management" as contemplated by the Act.

## II. BLM's Planned Roundup of Excess Horses for Capture and Removal

41.     According to an October 2008 Government Accountability Office (GAO) report on the Bureau of Land Management, "the BLM has not regularly reported to the public how many wild horses and burros are killed in the course of gathers." Gathers are dangerous to the animals being captured, and cause injury or death to a number of these wild horses. The 2008 GAO Report goes on to report that data collected from six of the ten states having Herd Management Areas (HMAs), from fiscal years 2005 to 2007, indicate that at least 1.2 percent of the horses removed from these states were euthanized or died during the gather process. Using this figure from the GAO, 1.2% of the 2,476 to 2,787 horses to be removed is equivalent to roughly 30 to 34 horses.

42.     Upon realizing that they have been caught, wild horses have been known to jump or attempt to jump the six foot panels of corrals in which they are held and/or throw themselves against the panels out of fear or in a desperate attempt to escape the restrictions on their movement imposed by the corrals. Some of these horses run head long into the barriers that restrict their escape, break their necks, and die. Others severely injure themselves in the process or are shot due to their injuries. Still other trapped wild horses suffer from what is called "capture myopathy," a condition affecting wild animals upon capture in which they react negatively to their confinement and lack of movement. Wild horses have been recorded as dying of capture myopathy.

43.     Additionally, the foaling season for the wild horses is typically in the spring months of April and May; therefore, many of the mares rounded up through the use of the helicopter gather will be nearly full-term in their gestation, in December through March. The roundup will take place during the height of the winter season, making the terrain rough and the

weather worse. The threat of abortion or other types of complications arising from such a situation is dangerously high.

44. BLM's planned roundup will ultimately lead to the inhumane maiming and death of the old, sick, or lame horses. During the course of gathering the wild horses on the range, inevitably the older and enfeebled horses will be injured amidst the chaos of the chase and stampede. Such injuries will lead to the horses' deaths on the range, rather than under more humane circumstances as contemplated by the statute and regulations. 16 U.S.C. § 1333(b)(2)(A).

45. Congress did not authorize BLM to "manage" the wild horses by corralling them for private maintenance or long-term care as non-wild, free-roaming animals off of the public lands, and such maneuvers are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; without observance of procedure required by the law; and in excess of statutory jurisdiction, authority, limitations, and short of statutory right. *See Colorado Wild Horse and Burro Coalition, Inc. v. Salazar*, 639 F. Supp. 2d 87 (D.D.C. 2009). Moreover, the statute expressly provides that BLM's management activities *shall* be at the *minimal* feasible level. 16 U.S.C. § 1333. Removal is authorized only for animals after a pre-determination at site that they are excess. 16 U.S.C. § 1333(b)(2). Congress' intention was for BLM to cull the herd at the site and remove only the excess horses. 16 U.S.C. § 1333(b)(2).

46. There is no procedure in the statute or regulations for removing non-excess animals. In the context of the planned roundup at Calico Mountains Complex, this means the roundup is illegal because it removes the horses before the determination is made as to which horses are excess. BLM is entitled to remove excess horses, but not in this fashion. BLM must go to the site on horseback, in helicopters or in motorized vehicles, make the determination and

transport *only* the excess horses off the range.  The roundup is illegal because it indiscriminately removes all horses, some of which will not be excess.

47.    In performing an indiscriminate roundup of virtually all the horses located within the Calico Mountains Complex, BLM is ignoring the statutory framework in place addressing the management of horses deemed to be in "excess."  16 U.S.C. § 1333(b)(2) describes methodology to be followed by BLM in its removal of excess individual horses from the range to reach AMLs. Section 1333(b)(2) specifically provides an "order and priority" for removal of excess animals "until all excess animals have been removed so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation." *Id.* § 1333(b)(2).  Specifically, it first provides that BLM "shall order old, sick, or lame animals to be destroyed in the most humane manner possible." *Id.* § 1333(b)(2)(A).  Second, BLM "shall cause such number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which [the Secretary] determines an adoption demand exists by qualified individuals . . . ." *Id.* § 1333(b)(2)(B).  Third, and as a last resort, BLM "shall cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible." *Id.* § 1333(b)(2)(C).  In § 1333(e), Congress also gave BLM authority to sell any excess animal that is more than ten years old or that has been offered unsuccessfully for adoption at least three times. *See id.* § 1333(e)(1).

48.    The statute is clear that this order must be followed during any removal action of the wild horses that may be taken by BLM.  It logically follows that identification of the excess wild horses, in order to determine which category ((A) through (C)) they fall in, *must* take place on the range, prior to any removal action.  "Removal" constitutes any action which moves the

wild horses from an area where they "presently exist." This gather will remove them from their present habitat. 16 U.S.C. § 1339 states: "Nothing in this chapter shall be construed to authorize the Secretary to relocate wild free-roaming horses or burros to areas of the public lands where they do not presently exist."

49.     BLM's "gather plan," outlined in the final EA, would indiscriminately capture virtually all the horses located on the range into corrals and holding pens, subverting the policy of the statute and regulations that these wild horses be managed by BLM with the goal of "maintaining free-roaming behavior." 43 CFR 4700.0-6(c) ("Management activities affecting wild horses and burros shall be undertaken with the goal of maintaining free-roaming behavior.").

50.     Rounding the wild horses up into corrals does not maintain free-roaming behavior – and adversely affects those rounded up and then re-released. This runs contrary to the policy clearly delineated in WFHBA. Furthermore, 43 C.F.R. § 4710.4 "Constraints on management" states: "Management of wild horses and burros shall be undertaken with the objective of limiting the animals' distribution to herd areas. Management shall be at the minimum level necessary to attain the objectives identified in approved land use plans and herd management area plans."

51.     Before BLM may begin to gather the thousands of horses as planned, it must first make the determination that each horse gathered falls in one of the three contemplated categories of "excess." 16 U.S.C. § 1333(b)(2). While it may be more convenient for BLM to perform this proper analysis from the holding pens, the statute and regulations do not permit them to do so.

52.     Additionally, BLM does not have any authority to remove non-excess horses. Any action that results in removing a horse from its habitat on the range and which is then released back is illegal. That, in itself, makes the proposed Calico Mountains Complex roundup

illegal.  If, in the gathering process, even one non-excess horse is rounded up as BLM plans, the process is illegal because non-excess horses cannot be removed.

53.     It is anomalous to infer that by authorizing the custodian of the wild free-roaming horses and burros to "manage" them, Congress intended to permit the animals' custodian to subvert the primary policy of the statute by capturing and removing from the wild the very animals that Congress sought to protect *from* being captured and removed from the wild.  *See Colorado Wild Horse and Burro*, 639 F. Supp. 2d at 96.

54.     The planned gather constitutes an illegal "capture" of the wild horses and is an abuse of the BLM's management authority.  BLM's management authority is limited, in that it should be at the "minimal feasible level."  The management activities envisioned by Congress in the statute are:

- the determination as to whether an overpopulation exists and whether action should be taken to remove excess animals;
- the determination of appropriate management levels of wild free-roaming horses and burros on public lands; and
- only the removal of adoptable excess horses from the range.

The chasing of wild horses by helicopter for the purposes of capture is an inhumane method beyond the pale of "minimal feasible level" of management, does not fall under any of BLM's authorized management activities, and should not be allowed to proceed, especially for purposes of identifying the excess horses as contemplated in 16 U.S.C § 1333(b)(2).  It was Congress' intention that the herds should be culled where the horses are found.  Once a horse is found that fits one of the "excess" categories, it should then be captured and either transported or herded to where it will be euthanized or adopted.  In it incongruous to roundup and herd old, sick and lame horses because many will likely die in the process.

55.     The stated Congressional policy in 16 U.S.C. § 1331 is clear – "It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death." BLM's planned roundup exposes the Calico Mountains Complex wild horses to all of these unfortunate consequences. The proposed illegal roundup runs counter to the minimal level of management BLM is supposed to be performing under the law.

56.     If BLM wishes to proceed with the roundup/gather as described in the final EA, BLM needs to go back to Congress and have the WFHBA amended so they may legally proceed with the roundups. As the statute and regulations stand now, roundups conducted in this manner are illegal.

57.     BLM's proposed action violates NEPA's requirement that it consider both the indirect and direct impact on the captured wild horses. *See* 40 CFR 1508.8 ("'Effects' include: … (b) **Indirect effects**, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable…. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative."); 40 CFR 1500.2 ("Federal agencies shall to the fullest extent possible: … (e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment."). Per the final EA (p. 46), "Indirect impacts are those impacts that occur once the excess animals are removed." Yet, the EA contains no analysis of the indirect effects on the wild horses from the day after their capture for the rest of their lives

58.     The EA states that animals would be transported to BLM facilities for "adoption, sale, or long-term holding." (Final EA at p. 12). But, it provides no analysis of whether – given

the tens of thousands of wild horses already in short-term holding and long-term holding

facilities, and the current state of our economy – "adoption" or "sale" is realistic (other than sales

that result in the horse being slaughtered). Nor does it analyze the impact on the wild horses

who are kept in short-term or long-term holding facilities, with no trees, canyons or other shelter.

Although the final EA makes one passing reference to "Palomino Valley Corral," it does not

even identify or describe the "final destination" or "long-term holding facility" for these captured

horses.

59.     There can be no doubt that the wild horses are part of the human environment to

be protected by the procedural safeguards of NEPA, before, during, and after their capture. And,

there can be no doubt that taking thousands of wild and free horses from their natural

environment and confining them in short-term or long-term holding facilities without any trees,

canyons or other shelter, perhaps leading to slaughter, has a significant impact on these wild

horses and environment. Yet, nowhere in the BLM's FONSI, DR, Preliminary EA, or final EA,

does it address the foreseeable impacts on the captured horses themselves from the moment they

arrive at the short-term and then long-term holding facility. This violates the spirit and letter of

NEPA and is a clear, arbitrary and capricious error of law, and renders the finding of no

significant impact a nullity.

## CLAIMS FOR RELIEF

## COUNT ONE

### (Violations of WFHBA, WFHBA Regulations and APA)

60.     Plaintiffs incorporate by reference here the allegations of the proceeding

paragraphs of this Complaint.

61.    BLM's actions exceed its express statutory mandate as articulated in § 1333(b)(2). First § 1333(b)(2)(A) prohibits BLM from capturing and removing old, sick, or lame horses because these horses must be culled on the range.   Second, § 1333(b)(2)(B) makes clear that the only horses that may be captured and removed from the range are excess adoptable horses.

62.    BLM's disregard of § 1333(b)(2) is an abuse of the agency's discretionary management authority under the statute and regulations, and is illegal.

63.    These actions must be set aside under the Administrative Procedure Act ("APA") because they are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law; without observance of procedure required by law, and in excess of statutory jurisdiction, authority, limitations, and short of statutory right.

**COUNT TWO**

**(Violations of WFHBA, WFHBA Regulations and APA)**

64.    Plaintiffs incorporate by reference here the allegations of the proceeding paragraphs of this Complaint.

65.    BLM's slated December 28, 2009 roundup violates §§ 1331 and 1339 of the WFHBA because BLM plans to relocate thousands of healthy, non-adoptable horses to public lands where the horses do not presently exist (namely Kansas, Oklahoma, and/or South Dakota).

66.    Pursuant to 16 U.S.C. § 1331, "wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands."   BLM may *not* relocate healthy, non-adoptable horses to areas of the public lands where they do not exist.   16 U.S.C. § 1339.

67.     BLM's proposed December 28, 2009 roundup will permanently relocate thousands of healthy, non-adoptable wild horses from the range and transfer them to long-term holding facilities on public lands where the horses do not exist.

68.     BLM's proposed capture of healthy, non-adoptable wild horses for relocation to long-term holding facilities on public lands where the horses do not exist is an abuse of BLM's discretionary management authority and is illegal.

69.     These actions must be set aside under the APA because they are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law; without observance of procedure required by law, and in excess of statutory jurisdiction, authority, limitations, and short of statutory right.

## COUNT THREE

### (Violations of WFHBA, WFHBA Regulations and APA)

70.     Plaintiffs incorporate by reference here the allegations of the proceeding paragraphs of this Complaint.

71.     BLM admits that the agency plans to capture and temporarily remove non-excess non-adoptable horses from the range, only to turn around and release hundreds of them back to the range.  These proposed actions violate §§ 1333(b)(2) and 1339, because non-excess, non-adoptable horses may not be removed from the range.

72.     BLM's disregard of §§ 1333(b)(2) and 1339 is an abuse of the agency's discretionary management authority under the statute and regulations, and is illegal.

73.     These actions must be set aside under the APA because they are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law; without

observance of procedure required by law, and in excess of statutory jurisdiction, authority, limitations, and short of statutory right.

## COUNT FOUR

### (Violations of NEPA, NEPA Regulations and APA)

74.     Plaintiffs incorporate by reference here the allegations of the proceeding paragraphs of this Complaint.

75.     BLM did not perform a proper NEPA analysis in that is should have considered both the indirect and direct impact on the captured wild horses and the human environment. The proposed actions violate 40 C.F.R. § 1508.8 and 40 C.F.R. § 1500.2, because nowhere in the BLM's final decision papers did the agency address the foreseeable impacts on the captured horses themselves and the human environment from the moment they arrive in the long-term holding facility.

76.     The failure to address the NEPA requirements in its final decision papers is a clear, arbitrary and capricious error of law, and renders the finding of no significant impact a nullity.

77.     These actions must be set aside under the APA because they are arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with law; without observance of procedure required by law, and in excess of statutory jurisdiction, authority, limitations, and short of statutory right.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and grant the following relief:

A.      Issue a declaratory judgment that: Defendant BLM's December 2009 Environmental Assessment for the Calico Mountains Complex violates the WFHBA, its implementing regulations, NEPA, its implementing regulations, and is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedure required by law, contrary to the APA.

B.      Permanently enjoin the planned roundup.

C.      Order BLM to conduct the gather in accordance with the statutory prescription set forth in the WFHBA.

D.      Declare BLM's policy of storing excess horses taken off the range in long-term holding facilities illegal under the WFHBA and NEPA.

E.      Permanently enjoin the transfer of the horses gathered during the planned Calico Mountains Complex roundup from being transferred to long-term holding facilities outside areas where the horses currently exist.

December 28, 2009                          Respectfully submitted,


William J. Spriggs
D.C. Bar No. 152116
bill.spriggs@bipc.com


/s/ David J. Taylor
David J. Taylor
D.C. Bar No. 91280
david.taylor@bipc.com

**Buchanan Ingersoll & Rooney P.C.**
1700 K Street, N.W.
Suite 300
Washington, D.C. 20006
Telephone: (202) 452-6051/6052
Fax:  (202) 452-7989

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of December, 2009, a copy of the foregoing Second Amended Complaint for Declaratory and Injunctive Relief was sent via certified mail to the following:

**Erik Edward Petersen**, Attorney for Federal Defendants
U.S. Department of Justice, Environment and Natural Resource Division
P.O. Box 7369
Washington, DC 20044
(202) 305-0339
Email: erik.petersen@usdoj.gov

**John B. Grosko**, Attorney for Federal Defendants
U.S. Department of Justice, Environment and Natural Resource Division
P.O. Box 7369
Washignton, DC 20044
(202) 305-0342
Email: brett.grosko@usdoj.gov

**Nhu Q. Nguyen**, Attorney for Movant, State of Nevada Department of Wildlife
Office of the Nevada Attorney General
100 No. Carson Street
Carson City, NV 89701
775-684-1232
Fax: 775684-1108
Email: nnguyen@ag.nv.gov

**Sheila D. Jones**, Attorney for Amicus, Coalition for Nevada's Wildlife
Holland & Hart, LLP
975 F Street, NW
Suite 900
Washington, DC 20004
(202) 654-6911
Email: sdjones@hollandhart.com

**Anna Margo Seidman**, Attorney for Amicus, Safari Club International
501 Second Street, NE
Washington, DC 20002
(202) 543-8733
Fax: (202) 543-1205
Email: aseidman@safariclub.org

**Douglas Scott Burdin**, Attorney for Amicus, Safari Club Internationl
501 Second Street, NE
Washington, DC 20002
(202) 543-8733
Fax: 202-543-1205
Email: dburdin@safariclub.org

William J. Spriggs