**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN DEFENSE OF ANIMALS** *et al.*,     ) | |
| ) | **1:09-cv-02222 (PLF)** |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **KEN SALAZAR, Secretary of the Interior,** *et* ) | |
| *al.*, ) | |
| ) | |
| **Defendants,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **SAFARI CLUB INTERNATIONAL, SAFARI** ) | |
| **CLUB INTERNATIONAL FOUNDATION** ) | |
| ) | |
| **Defendant-Intervenors.** ) | |
| ) | |
| ) | |
| _____ ) | |
| ) | |

**SAFARI CLUB INTERNATIONAL AND SAFARI CLUB INTERNATIONAL
FOUNDATION'S MEMORANDUM OF POINTS AND AUTHORITES IN SUPPORT OF
CROSS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

TABLE OF AUTHORITIES ................................................................................................... iii

I.      INTRODUCTION ............................................................................................................ 1

II.     RELEVANT LAW .......................................................................................................... 3

   A.  The Wild Free-Roaming Horses and Burros Act ........................................................ 3

   B.  Federal Land Policy and Management Act .................................................................. 6

   C.  National Environmental Policy Act ............................................................................ 7

   D.  Administrative Procedure Act ..................................................................................... 7

III.    RELEVANT FACTS ...................................................................................................... 8

   A.  The Calico Mountain Complex Wild Horse Round-Up and Capture .................................. 8

   B.  Legislative History on Wild Horse Management Appropriations and Congress' Support for Long-Term Holding on Private Sanctuaries ............................................................. 11

   C.  The Bureau's Use of Private Long-Term Holding Facilities and NEPA Compliance For the Use of These Facilities ................................................................................... 16

   D.  Pertinent Facts Pertaining to this Litigation ..................................................... 18

IV.     ARGUMENT .................................................................................................................. 19

   A.  The Plaintiffs Have Failed to Demonstrate Standing ..................................................... 19

      1.  In Defense of Animals Has Not Supported Its Vague Allegations of Standing ............. 20

      2.  Downer and Farley Fail to Establish Injury, Causation, and/or Redressability .............. 21

      3.  Downer and Farley Have Not Proven that the Court Can Redress Their Alleged Injury of Viewing Fewer Horses on the Range During Future Visits ................................ 22

      4.  The Transfer of the Excess Horses to Long-Term Facilities Would Not Cause the Alleged Injury of Viewing Fewer Horses on the Range ........................................ 23

      5.  "Some Day" Intentions to Return to An Area are Insufficient to Establish Standing ..... 25

   B.  The Wild Horses Act Provision Governing the Relocation of Horses Does not Address Relocating Excess Horses to Private and/or Non-Public Lands .............................. 26

   C.  The Wording and the Legislative History of Appropriations Laws Provides the Requested Evidence of Congress' Approval of Long-Term Facilities ...................................... 27

   D.  This Court Should Not Adopt A Statutory Interpretation That Undermines the Sense and Purpose of the Wild Horses Act .................................................................. 29

   E.  Section 1732(b) Authorizes the Bureau to Transfer the Horses to Long-Term Facilities ... 32

   F.  The Bureau's Environmental Assessment for the Round-Up and Capture Complied with NEPA Requirements ............................................................................... 35

V.      CONCLUSION ............................................................................................................... 36

# TABLE OF AUTHORITIES

## Cases

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc*. 462 U.S. 87 (1983)... 8

*Center for Law and Educ. v. Dept. of Labor*, 396 F.3d 1152, 1160 n.2 (D.C. Cir. 2005)........... 23

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)................................................ 7

*Coalition for Lower Beaufort County v. Alexander*, 434 F. Supp. 293 (D.D.C. 1977) ............... 35

*Donovan v. Stalite Co*., 734 F.2d 1547 (D.C. Cir. 1984)............................................................. 32

*Fallini v. Hodel*, 725 F. Supp. 1113 (D. Nev.1989) ...................................................................... 4

*Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658 (D.C. Cir. 1996).............................................. 20

*Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006)...... 27

*Hunt v. U.S.,* 278 U.S. 96 (1928) ................................................................................................. 33

*Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 334 (1977) ..................................... 21

*In Defense of Animals v. Salazar*, 2009 WL 4981172 (D.D.C. 2009).............................. passim

*In Re Navy Chaplaincy*, 534 F.3d 756 (D.C. Cir. 2008)........................................................ 19, 26

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976).................................................................................. 7

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ..................................................... 20, 22, 25

*Morton v. Mancari*, 417 U.S. 535 (1974) ................................................................................... 30

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co*., 463 U.S. 29 (1983)........................... 7, 8

*Natural Law Party of the United States of America v. Federal Election Comm'n,* 111 F.Supp.2d 33 (D.D.C. 2000) .......................................................................................................................... 23

*Newman-Green, Inc. v. Alfonzo-Laurain,* 490 U.S. 826 (1989) ................................................. 23

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)............................................ 7

*Schism v. United States*, 316 F.3d 1259 (Fed. Cir. 2002) ........................................................... 27

*Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83 (1998)....................................................... 25

*Taylor v. Resolution Trust Co.,* 56 F.3d 1497 (D.C. Cir. 1995) ............................................ 22, 25

*U.S. Ecology, Inc. v. Department of the Interior,* 231 F.3d 20 (D.C. Cir. 2000)........................ 23

*U.S. v. Hunt,* 19 F.2d 634 (D. Az. 1927) .................................................................................... 33

*United States v. Borden Co.*, 308 U.S. 188 (1939) ..................................................................... 30

*United States v. Rutherford*, 442 U.S. 544 (1979) ..................................................................... 29

*Watt v. Alaska*, 451 U.S. 259 (1981)........................................................................................... 30

## Statutes

16 U.S.C. § 1331 *et seq*............................................................................................................... 3

16 U.S.C. § 1332(b) .................................................................................................................. 5, 29

16 U.S.C. § 1332(e) .................................................................................................................. 5, 26

16 U.S.C. § 1332(f)......................................................................................................................... 5

16 U.S.C. § 1333 ......................................................................................................................... 30

16 U.S.C. § 1333(a) ....................................................................................................................... 4

16 U.S.C. § 1333(b)(2) ........................................................................................................... 2, 4, 5

16 U.S.C. § 1339...................................................................................................................5, 26, 34

16 U.S.C. § 1531 *et seq*............................................................................................................... 3

42 U.S.C. § 4332(C) ...................................................................................................................... 7

43 U.S.C. § 1701 *et. seq*............................................................................................................... 6

43 U.S.C. § 1701(a)(8)................................................................................................................... 6

43 U.S.C. § 1732(a) ...................................................................................................................... 6

*43 U.S.C. § 1732(b) ........................................................................................................ passim
5 U.S.C. § 701 *et seq.*..................................................................................................... 7
5 U.S.C. § 706(2)(A)........................................................................................................ 7
Pub. L. No. 111-88, 123 Stat. 2904 (2009)..................................................................... 16

**Regulations**
40 C.F.R. § 1501.4(b) ...................................................................................................... 7
40 C.F.R. § 1508.9 ....................................................................................................... 7, 35

**Legistative History**
133 Cong. Rec. H5524 (daily ed. June 25, 1987), enacted as Pub L. No. 100-202 (1987) 6, 11, 28
Department of the Interior and Related Agencies Appropriations for 1992 Before the Subcomm.
    on the Department of the Interior and Related Agencies of the H. Comm. on Appropriations,
    102nd Cong. 90-91 (1991) (Justification of the Budget Estimates, Bureau of Land
    Management) ............................................................................................................. 14
Department of the Interior and Related Agencies Appropriations for 1994 Before the Subcomm.
    on the Department of the Interior and Related Agencies of the H. Comm. on Appropriations,
    103rd Cong. 89 (1993) (Justification of the Budget Estimates, Bureau of Land Management) 14
Department of the Interior and Related Agencies Appropriations for 1995 Before the Subcomm.
    on the Department of the Interior and Related Agencies of the H. Comm. on Appropriations,
    103rd Cong. 622-623 (1994) (Justification of the Budget Estimates, Bureau of Land
    Management) ............................................................................................................. 15
Department of the Interior and Related Agencies Appropriations, Fiscal Year 1991 Before the S.
    Comm. on Appropriations, 101st Cong. 19 (1990) (testimony of Cy Jamison, Director, Bureau
    of Land Management)............................................................................................. 15, 16
H.R. Rep. No. 100-498 (1987) (Conf. Rep.)............................................................... 13
S. Rep. No. 100-165 (1987)............................................................................................ 12
S. Rep. No. 101-534 (1990)............................................................................................ 14

# I.   INTRODUCTION[1]

Defendant-Intervenors Safari Club International and Safari Club International Foundation ("Safari Club") by and through counsel, file this Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment.  In accordance with the requirements of the Wild Free-Roaming Horses and Burros Act ("Wild Horses Act")[2], the Federal Land Policy and Management Act ("FLPMA"), the National Environmental Policy Act ("NEPA") and the Administrative Procedures Act ("APA"), the Bureau of Land Management ("Bureau") carried out a roundup and capture of horses located on the Calico Mountains Complex ("Complex").  The round-up and capture commenced on December 28, 2009.  The Bureau conducted the roundup and capture to remove horses that contributed to an overpopulation of wild horses jeopardizing the habitat and the health of the wild horse population as well as the health of numerous other wildlife species that share the Complex.  The Bureau properly designated a number of the captured horses as "excess" and intends to transfer those excess horses to long-term facilities, located on non-public lands[3] and operated as horse sanctuaries by private contractors.

---

[1] In an effort to avoid or at least reduce redundancy in the three briefs that will be filed by the Federal Defendants and the two Defendant-Intervenors, Safari Club will not attempt to address each and every argument presented by the Plaintiffs in their Memorandum in Support of their Motion for Summary Judgment.  Instead, for those of Plaintiffs' arguments not addressed in this memorandum, Safari Club incorporates by reference and will rely on the arguments submitted by the Federal Defendants in support of their own motion for summary judgment and opposition.

[2] Although Congress drafted the Wild Horses Act to apply to both horses and burros, this case focuses exclusively on the wild horses of the Complex.  For that reason, in this memorandum, Safari Club will refer exclusively to wild horses.

[3] One long-term facility is run, in part, on Bureau of Indian Affairs land.  White Horse Wild Horse Long-Term Holding Facility in South Dakota.  AR 28909.  Another facility, Mission Ridge Long-Term Holding Pasture, encompasses state land under control of a private contractor. AR 29158

In the legislative history of numerous appropriations bills that addressed the Bureau's budget for the management of wild horses, Congress has expressly endorsed the transfer of horses to these long-term private sanctuaries in Oklahoma, Kansas and South Dakota.  Even the language of these appropriations bills demonstrates Congress' implicit acknowledgment of long-term holding of horses at these private facilities.

The Bureau's transfer of excess horses to these long-term holding facilities is not only legal – it is required by the Wild Horses Act.  Congress mandated that the Bureau "immediately remove excess animals from the range so as to achieve appropriate management levels" and to "restore a thriving natural ecological balance to the range."  16 U.S.C. § 1333(b)(2).  If the Bureau is required to remove excess animals from the range, but is prohibited, via restrictions dictated by appropriations legislation, from destroying any of those excess animals, then storage is the only current viable solution.  If the Bureau is precluded from transferring horses to private, sizeable long-term facilities outside Nevada, then long-term corralling at the current short term storage facilities becomes the Bureau's only option.  Although located in areas on or close to the horses' home ranges, these short-term facilities are small, inadequate in terms of space and habitat and undermine the concept of a "thriving natural ecological balance to the range."  *Id.*  Even if the Wild Horses Act does not authorize the transfer of excess horses to long-term private facilities, FLPMA does.  In transferring the horses to non-public lands, the Bureau is exercising its authority under FLPMA to take "any action necessary to prevent unnecessary or undue degradation of the lands."  43 U.S.C. § 1732(b).

The Bureau's conduct also fulfills its NEPA obligations.  Plaintiffs, In Defense of Animals *et al.* ("IDOA") challenge the sufficiency of the Bureau's analysis of the life of the horses after they leave the Complex.  That NEPA obligation is more than fulfilled by the

Environmental Assessments that the Bureau prepared for each of the individual long-term facilities to which the excess horses can be transferred. Additional NEPA would be redundant and unnecessary.

Finally, regardless of the legality of any of the Bureau's actions with respect to the Complex's horses, Plaintiffs lack the Constitutional standing to challenge those actions. Plaintiffs' alleged injuries are either or both not caused by the Bureau's actions or are not redressable by this Court. In addition, their allegations of injury are based on insufficiently concrete plans to visit the Complex in the future.

Safari Club respectfully requests, for the reasons discussed below, that this Court deny Plaintiffs' motion for summary judgment, grant summary judgment to the Defendants and Defendant-Intervenors and dismiss Plaintiffs' action.

## II.  RELEVANT LAW

### A.  The Wild Free-Roaming Horses and Burros Act

The Wild Free-Roaming Horses and Burros Act ("Wild Horses Act") 16 U.S.C. § 1331 *et seq.* directs the Bureau of Land Management and the Forest Service[4] to achieve and manage healthy herds of wild horses on public lands within their existing home ranges in balance with the other species with which those horses share habitat. Unlike other federal wildlife-oriented laws, such as the Endangered Species Act, for example, 16 U.S.C. § 1531 *et seq.*, the Wild Horses Act does not direct the administering agencies to strive towards increased numbers of horses or herds, nor does it give wild horses priority over other wildlife species. *Fallini v. Hodel*, 725 F. Supp. 1113, 1118 (D. Nev.1989) (court held that Wild Horses Act does not give

---

[4] Although the Wild Horses Act provides management direction and authority to both the Bureau of Land Management and the Forest Service (through the Secretaries of the Interior and Agriculture), because this case challenges an action of the Bureau of Land Management, this brief will refer only to the Bureau's authorities and obligations.

horses higher status than cattle on public lands when considering grazing concerns), *aff'd*. 963 F.2d 275 (9th Cir. 1992).  Instead, the Wild Horses Act focuses on improvement of wild horse herds as a component of multiple species sharing a common environment.  The statute specifically directs the Bureau to conduct horse population reduction, where necessary, to achieve that goal.  The law, in pertinent part, directs that the Secretary of the Interior:

> shall manage wild free-roaming horses and burros **in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands**. He shall consider the recommendations of qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies and may include members of the Advisory Board established in section 1337 of this title. All management activities shall be at the minimal feasible level and shall be carried out in consultation with the wildlife agency of the State wherein such lands are located **in order to protect the natural ecological balance of all wildlife species which inhabit such lands,** particularly endangered wildlife species.

*Id*. at § 1333(a) (emphasis added).  Nothing in the Wild Horses Act endorses the concept that more is better, or that the public is entitled to demand denser populations of horses for their personal or commercial enjoyment.  In fact, the law requires just the opposite.  The Wild Horses Act specifically directs the Bureau to determine where there are overpopulations of wild horses and in such cases to take action to reverse those conditions.  The Bureau is required to:

> make determinations as to whether and where an overpopulation exists and whether action should be taken to remove excess animals; determine appropriate management levels of wild free-roaming horses and burros on these areas of the public lands; and determine whether appropriate management levels should be achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)

*Id*. at § 1333(b)(1).  If the Bureau finds an overpopulation to exist, the Act directs the Bureau to take the following actions:

> [H]e **shall immediately remove excess animals from the range** so as to achieve appropriate management levels. Such action shall be taken, in the following order and priority, until all excess animals have been removed **so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation**:

4

**(A)** The Secretary shall order old, sick, or lame animals to be destroyed in the most humane manner possible;

**(B)** The Secretary shall cause such number of additional excess wild free-roaming horses and burros to be humanely captured and removed for private maintenance and care for which he determines an adoption demand exists by qualified individuals, and for which he determines he can assure humane treatment and care (including proper transportation, feeding, and handling): *Provided*, That, not more than four animals may be adopted per year by any individual unless the Secretary determines in writing that such individual is capable of humanely caring for more than four animals, including the transportation of such animals by the adopting party; and

**(C)** The Secretary shall cause additional excess wild free-roaming horses and burros for which an adoption demand by qualified individuals does not exist to be destroyed in the most humane and cost efficient manner possible.

*Id*. §1333(b)(2) (emphasis added).  Section 1333(b) requires the Bureau to remove "excess" wild free-roaming horses, defined by the Wild Horses Act as:

wild free-roaming horses or burros (1) which have been removed from an area by the Secretary pursuant to applicable law or, (2) which must be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area.

16 U.S.C. § 1332(f).  The protections of the Wild Horses Act apply only to wild horses present on "public lands."  Wild and free-roaming horses are defined as "all unbranded and unclaimed horses . . .  on ***public lands*** of the United States."  *Id.* at § 1332(b)(emphasis added).

Although the Wild Horses Act prohibits the Bureau from relying on Wild Horses Act authority to relocate wild horses to ***public lands*** where they "do not presently exist," there is no such prohibition for relocation to private lands.  16 U.S.C. § 1339.  The statute defines "public lands" as "any lands administered by the Secretary of the Interior through the Bureau of Land Management or by the Secretary of Agriculture through the Forest Service."  16 U.S.C. § 1332(e).  Nothing in the law prohibits the Bureau from relocating wild horses to long-term

facilities or sanctuaries located on private land (or on land administered by a state authority or some federal agency other than the Bureau or the Forest Service.)

Although the Wild Horses Act specifically directs the Bureau to destroy unadopted excess horses, that mandate is contradicted by language in appropriations legislation.  As early as 1987, Congress, through appropriation bills, countermanded the Bureau's authority to destroy excess wild horses by prohibiting the use of funding for such activities.

> *Provided*, That appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau of Land Management *or its contractors*."

133 Cong. Rec. H5524 (daily ed. June 25, 1987) (emphasis added) (enacted as Pub L. No. 100-202) (1987) (attached as Exhibit "A").  The appropriations bills not only imposed the restriction on the Bureau itself, but extended that restriction to the Bureau's "contractors," namely the private individuals to whom the Bureau contracted out authority to care for those unadopted, excess horses.

## B.  Federal Land Policy and Management Act

The Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701 *et. seq.*, directs the Bureau to manage public lands in a manner "that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmosphere, water resource, and archeological values."  *Id.* § 1701(a)(8).  At the same time, FLMPA imposes upon the Bureau the duty to manage public lands under principles of multiple use and sustained yield.  *Id.* § 1732(a).  Finally, "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands."  *Id.* § 1732(b).

### C.  National Environmental Policy Act

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §4321 *et seq*. requires that each federal agency take a "hard look" at the environmental consequences of proposed major federal actions.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).  NEPA imposes procedural not substantive mandates, and thus requires no specific outcome as a result of that "hard look."  The law requires that federal agencies prepare Environmental Impact Statements ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  To determine whether an EIS is necessary, the agency may first prepare a somewhat less detailed analysis in the form of an Environmental Assessment ("EA").  40 C.F.R. §§ 1501.4(b), 1508.9.  If the EA reveals no significant environmental impacts from the proposed action, then the agency need not prepare an EIS, and may conclude its assessment with a Finding of No Significant Impact ("FONSI").

### D.  Administrative Procedure Act

Judicial review of agency conduct, including the exercise of discretion in administering the Wild Horses Act, is controlled by Section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §701 *et seq*.  Pursuant to the APA, a court may set aside an agency's action if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  See also *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co*., 463 U.S. 29, 41 (1983); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *overruled on unrelated grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  The arbitrary and capricious standard of review is narrow and a court is not permitted to substitute its judgment for that of the

agency.  *Motor Vehicle Mfrs. Ass'n*., 463 U.S. at 43.  A court may not set aside an agency action that is rational, based on consideration of relevant factors and is within the scope of the authority that the agency has been statutorily granted.  *Id*. at 42-43.  In cases where the challenged activity involves the agency's scientific expertise, courts must be "most deferential" to the agency's decision making.  *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc*. 462 U.S. 87, 103 (1983).

## III.   RELEVANT FACTS[5]

### A.  The Calico Mountain Complex Wild Horse Round-Up and Capture

The Bureau prepared a plan to capture and remove 2,432-2,468 excess wild horses from the Calico Mountains Complex ("Complex") and published a final Environmental Assessment on the Calico Mountains Complex Capture Plan ("Final EA") on December 8, 2009, along with a FONSI.

---

[5] Contrary to the Local Rules, IDOA has submitted with its motion for summary judgment a "Plaintiffs' Statement of Undisputed Facts."  Dkt. 40-2.  In filing this document, IDOA purports to rely on Local Rules 7(h) and 56.1.  But Local Rule 7(h) has been amended and Rule 56.1 has been deleted.  See Order, September 2, 2008, signed by Chief Judge Lamberth, http://www.dcd.uscourts.gov/LocalRuleChanges-090208.pdf.  Under amended Rule 7(h)(2), the requirements of paragraph (1) [which is Local Rule 7(h) before it was amended] "shall not apply to cases in which judicial review is based solely on the administrative record.  In such cases, motions for summary judgment and oppositions thereto shall include a statement of facts with references to the administrative record."  No one disputes that this is an administrative record review case.  Thus, IDOA's Statement of Undisputed Facts is unauthorized and a nullity.  SCI and SCIF will not respond to it with a "statement of genuine issues," as Local Rule 7(h)(2) prohibits such a filing.  Instead, SCI and SCIF will include its statement of facts within its motion for summary judgment.  SCI and SCIF further notes that IDOA's so-called "Statement of Undisputed Facts" contains (1) legal conclusions and arguments, ¶¶ 1,2,8,9; (2) improper citation to post-decision documents, ¶¶ 6,7,10; (3) attached exhibits that should properly be a part of the parties' Joint Appendix (*see* Local Rule 7(n)), ¶ 11; and (4) allegations unsupported by reference to the administrative record, ¶¶ 4,5.

The goals of the Complex Capture Plan are to restore a thriving natural ecological balance to the Complex, and to prevent further degradation of habitat caused by an overpopulation of wild horses. The capture was set to commence on December 28, 2009.

The capture plan incorporated a strategy for designating sick and lame animals. Although deemed by the Bureau to be infeasible as an entirely separate operation, the identification, isolation, and euthanasia of such horses, where necessary, was conducted as an element of the capture.  AR 7023, 7086-7087.

In the process of preparing the plan, the Bureau engaged the public to gain their input. The governmental, public and private entities that use and manage the wildlife, livestock and land involved in the effort, supported the horse population reduction and the capture.

> On-going consultation with Resource Advisory Councils, the Nevada Department of Wildlife, US Fish and Wildlife Service, livestock operators and others, underscores the need for Bureau to maintain wild horse and burro populations within appropriate management level (AML). Consultation between the Bureau, State of Nevada Commission for the Preservation of Wild Horses and the Sierra Club occurred in November 2008. These groups toured the area proposed for the gather and jointly concurred that the gather was needed based on the observed effects to rangeland resources from the over-population of wild horses. The conclusion of the group was that the gather was needed to protect the natural resources as well as the wild horses.

AR 7073-7074.

In September 2009, the Bureau conducted an aerial inventory and determined the Complex's wild horse population to be 3,040 wild horses. That number is about three times the high range Appropriate Management Level ("AML") of 952 animals.  AR 7008-7009.  The Bureau estimates that the horse population is increasing by 20-27% per year.  AR 7047. Without the planned reduction strategies, in four years, the population would likely exceed 7,000 and in over ten years it would increase to 9,500 horses.  The agency estimates that the highest average population could reach up to 11,662 horses.  AR 7064.

The overpopulation issues have been exacerbated by the extreme drought conditions taking place within the Complex since 2005.

> Drought conditions combined with the overpopulation of wild horses above AML has caused some water sources within the Complex to dry up and become unavailable for use by wild horses, livestock or wildlife. This has further compounded the issue of already limited waters within the Complex. Drought conditions are evident throughout the Complex, as indicated by low forage production in some areas and decreased water flows throughout riparian systems including spring brooks, perennial and intermittent streams and developed water sources used by wildlife, livestock and wild horses.

AR 7009.  The overpopulation of wild horses within the Complex, compounded by drought conditions, has caused concentrated use by wild horses of limited water sources and depletion of the vegetation near those water resources.  AR 7046.  With less water and more horses, the health of the horse population had been placed in jeopardy.  Mares and foals are at greatest risk. Mares become unable to both maintain their own weight and provide milk for the foals.  AR 7049.  Eventually, all horses will succumb to the effects of insufficient water:

> With reduction of water availability compounded by an excess population of wild horses, animals are forced to trail farther and farther from water to avoid competition and locate adequate forage. As conditions further deteriorate and water is in short supply, wild horses will hang at waters, waiting for their turn, or waiting for the water catchments to fill back up. They become more and more weak as they become dehydrated, and can no longer trail long distances to forage. Eventually all forage near waters is consumed, and wild horses lose body weight.

AR 7049.

Because wild horses have few predators in the area, without the Bureau's intervention, the horses' numbers will simply continue to increase, exacerbating the problem.  Without the round-up and removal of a significant percentage of the herd, the horse populations would inevitably overwhelm their habitat.  At the point where the habitat can no longer support the population, the horses will experience a "substantial death loss."  AR 7050.   The Bureau refuses to manage by inaction and considers the notion of allowing the horses to die from starvation and

dehydration to be inhumane and inconsistent with the requirements of the Wild Horses Act.  AR 7065.

An overpopulation of horses jeopardizes the Complex's other wildlife populations as well.  Nevada Department of Wildlife ("NDOW") biologists have witnessed horses in bighorn sheep habitat, competing with the sheep for water.  "NDOW biologists have observed wild horses chasing bighorn ewes and lambs away from low yield springs in the Complex." AR 7051. Similar competitions have been noted between wild horses and mule deer at water sources.  *Id*.

The planned capture, in accordance with Wild Horses Act statutory and regulatory mandates, is designed to remove excess members of the wild horse population and to restore that population to a healthy, self-sustaining herd that can co-exist with other resident wildlife. Without the capture, conducted in the winter months, the harm to the wild horses and to other resident species will increase to the point where suffering and death from dehydration and starvation will be inevitable.

**B.  Legislative History on Wild Horse Management Appropriations and Congress' Support for Long-Term Holding on Private Sanctuaries**

In 1987, Congress countermanded the Bureau's mandate to destroy unadoptable excess wild horses.  Congress inserted into the 1988 appropriations bill a prohibition against the Bureau's use of funds for the destruction of wild horses and burros.  Congress did not simply limit the conduct of the Bureau as to horses in its care, but also extended the prohibition to horses in the care of the Bureau's "contractors."

> *Provided*, That appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau of Land Management *or its contractors*."

133 Cong. Rec. H5524 (daily ed. June 25, 1987) (emphasis added) (attached as Exhibit "A.") This language later became part of the law enacted as PL 100-202 (December 22, 1987).  The

Bureau's "contractors" are the private individuals with whom the Bureau contracts for the long-term holding and care of excess horses.  Not only was Congress aware of that fact, but the drafters expressly endorsed the use of these contractors.

Concrete evidence of Congress' approval of these arrangements is demonstrated in the Committee discussions that took place during the budget hearings on the 1988 appropriations bill.   For example, during those same budget discussions, the Senate Committee on Appropriations stated their endorsement of the Bureau's use of private sanctuaries for the long-term holding of excess, unadopted horses:

> The Committee is aware that a number of proposals have been discussed concerning the use of private sanctuaries as a method of removing excess animals from BLM corrals.  The Committee *has no objection* to the Bureau investigating the private sanctuary proposals, in conjunction with interested private groups, ***and in implementing sanctuary proposals that are found to be humane and cost effective***.  The Bureau should notify the Committee prior to funding private sanctuary proposals, in keeping with existing reprogramming guidelines.

S. Rep. No. 100-165, at 6 (1987) (emphasis added) (attached as Exhibit "B.").  The placement of the foregoing discussion, approving the Bureau's use of long-term facilities, is just as significant as its content.  The foregoing dialogue immediately preceded the Senate Committee's discussion of the language of the prohibition against the Bureau's use of funding for the destruction of healthy unadopted wild horses and burros:.

> The Committee has modified House-proposed bill language prohibiting the use of fiscal 1988 fund for the destruction of healthy, unadopted, wild horses and burros. The Bureau's draft policy contemplated such destruction and the Committee would rather pursue other, more humane, strategies to resolve the excess wild horse and burro issue.

*Id*. at p. 7, Exhibit B.   The juxtaposition of these two related discussions is evidence that the drafters' inclusion of horses in the care of the Bureau's "contractors," in the statutory prohibition against destruction of excess horses, represents an acknowledgement that Congress approved and

endorsed the care of horses by these contractors.  Had Congress not endorsed the contractors'
involvement with the care of these unadoptable excess horses, Congress would not have needed
to include them in the language of the appropriations prohibition.

Similarly, the House Appropriations Committee's discussion of the 1988 budget includes
language stating that "the managers have no objections to the Bureau ***investigating proposals for
private sanctuaries for wild horses or burros and implementing proposals*** which are both
humane and cost effective."  H.R.  Rep. No. 100-498, at p. 869 (1987) (Conf. Rep.) (emphasis
added) (attached as Exhibit "C.").  Again, this language unequivocally expresses the
Committee's approval of the Bureau's use of these contractual arrangements with private
individuals operating sanctuaries for long-term horse holding.

Similar language appears in the discussions of later budgets.  For example, during its
review of the Department of the Interior's budget for 1991, the Senate Committee on
Appropriations, just prior to reinstating the restriction on the use of funds for the destruction of
horses, again expressly voiced its approval of the Bureau's strategy for transferring excess horses
to private long-term holding facilities.  Again, this discussion immediately preceded the
Committee's readoption of language restricting the Bureau and its "contractors" from using
funds for the destruction of excess horses.  The Committee's report on H.R.5769, "Department
of the Interior and Related Agencies Appropriations Bill, 1991" from October 2, 1990 offered
the following:

> The Committee continues to support the use of private sanctuaries as a method of
> removing unadopted wild horses and burros.  BLM should continue to investigate
> private sanctuary proposals that are found to be humane and cost effective.  The
> Bureau is directed to notify the Committees on Appropriations prior to funding
> any new private sanctuary proposals.
> The Committee has retained bill language to continue the prohibition on the use
> of funds for the destruction of healthy unadopted wild horses and burros.

S. Rep. No. 101-534, at 6 (1990) (attached as Exhibit "D"). In accordance with the foregoing

direction, the Bureau made certain to inform Congress of the status and progress of its efforts to

place excess horses on private sanctuaries.  For example, in the "Justification of the Budget

Estimates" prepared for the hearings on the Department of the Interior and Related Agencies

Appropriations for 1994, the Bureau submitted the following explanation of its private long-term

sanctuary program:

> A portion of an average herd is composed of healthy animals that are either too
> old to be desirable for adoption or possess some physical impairment making
> them unadoptable.  In 1988, the BLM initiated a sanctuary program as an
> alternative to destruction or fee-waiver adoptions of these healthy but otherwise
> unadoptable wild horses.  The sanctuaries provided an opportunity for
> unadoptable wild horses to roam relatively undisturbed on selected private lands.
> The BLM established 2 sanctuaries which had the capacity to maintain
> approximately 4,000 animals.
>
> The sanctuary program was structured so that Federal funding would be provided
> for 3 years to enable the sanctuaries to start up and to have time for private fund
> raising efforts to raise sufficient capital to sustain a sanctuary's operation.
> However, private donations were not sufficient to sustain sanctuary operations
> without continued Federal assistance, and the original sanctuary agreements have
> expired.  The BLM has entered into and will fund annual agreements with the
> previous sanctuary operators to maintain the horses on site until they can be
> adopted or until suitable alternatives are developed to remove the horses from the
> sanctuaries.

Department of the Interior and Related Agencies Appropriations for 1994 Before the Subcomm.

on the Department of the Interior and Related Agencies of the H. Comm. on Appropriations,

103rd Cong. 89 (1993) (Justification of the Budget Estimates, Bureau of Land Management)

(attached as Exhibit "E").   See also, Department of the Interior and Related Agencies

Appropriations for 1992 Before the Subcomm. on the Department of the Interior and Related

Agencies of the H. Comm. on Appropriations, 102nd Cong. 90-91 (1991) (Justification of the

Budget Estimates, Bureau of Land Management) (attached as Exhibit "F"); Department of the

Interior and Related Agencies Appropriations for 1995 Before the Subcomm. on the Department

14

of the Interior and Related Agencies of the H. Comm. on Appropriations, 103rd Cong. 622-623

(1994) (Justification of the Budget Estimates, Bureau of Land Management) (attached as Exhibit

"G.").

These private sanctuaries were also, at times, the subject of the Bureau's testimony to the

Senate in support of agency budget requests.  For example, the following discussion took place

in November 1990 between Senator Harry Reid and Bureau Director Cy Jamison during Senate

Hearings Before the Committee on Appropriations:

Wild Horse Sanctuaries

Senator Reid.  How are the sanctuaries working?
Mr. Jamison.  The Sanctuaries are for the care of the horses that are
unadoptable, and they work very well, but they are also very expensive.  We have
two up and operating.  That is all we anticipate having.  We have one in South
Dakota, and one in Bartonsville, OK, and they have been very well run.
I personally have a feeling that they are not going to be able to be self-funded at
the end of 3 years.
Senator Reid.  But even if they weren't, and I just throw this out as a
question more than an answer, but even if they weren't, it would still be cheaper
than keeping them where we have in the past, would it not?
Mr. Jamison.  I would say if we had any choices, I would rather go with
the sanctuary than just warehousing them down in some BLM corral.  I agree with
that, Senator.

Department of the Interior and Related Agencies Appropriations, Fiscal Year 1991 Before the S.

Comm. on Appropriations, 101st Cong. 19 (1990) (testimony of Cy Jamison, Director, Bureau of

Land Management) (attached as Exhibit "H.").  Later, during that same hearing, Senator

McClure offered the following opinion of the sanctuary program:

It seems to me that the sanctuaries, under the management of people like
Mr. Hyde, and not necessarily just Mr. Hyde, have a great deal of promise, and I
would hate to see that promise aborted at the beginning because of the failure of
funding.
Now, I am not unwilling to look at exactly what the chairman said in
terms of comparative costs, but I had assumed, perhaps naively, that people who
really cared were going to get behind Mr. Hyde and his efforts, and that we would

15

> find that to be a successful program, and we would find the alternative that we
> have all been looking for.
>
> But I don't think, Mr. Director, that the answer lies in leaving them on the
> public range.

*Id.* at 21.  That same language, prohibiting the use of funding for the destruction of excess horses

in the care of the Bureau *or its contractors*, has repeatedly appeared in appropriations legislation,

including as recently as 2009.  Pub. L. No. 111-88, 123 Stat. 2904, 2907 (2009).

### C.   The Bureau's Use of Private Long-Term Holding Facilities and NEPA Compliance For the Use of These Facilities

Since the 1980's the Bureau has entered into contractual agreements with numerous

private individuals for the long-term holding of excess horses.  All such private sanctuaries are

situated on non-public lands, as defined by the Wild Horses Act.  The majority of these

sanctuaries are located on private property.  One is operated, in part, on lands managed by the

Bureau of Indian Affairs.  AR 28909.  Another is operated partially on state lands controlled by a

private contractor.  Mission Ridge Long-Term Holding Pasture, AR 29158.  None are located on

lands administered by the Bureau or the Forest Service.  The sanctuaries are spread throughout a

number of Western states including Oklahoma, Kansas and South Dakota.

Prior to entering into these contracts, the Bureau complied with its NEPA requirements

by preparing an EA for the establishment of each holding facility.    These NEPA documents are

all included in the Administrative Record considered by the Bureau in its planning for the round-

up and capture of the Complex's horses.  For example, these long-term, privately operated

facilities include Bartlesville Wild Horse Long-Term Holding Facility in Oklahoma (2,300

horses on 19,155 acres) EA at AR 28626 - 28693; Mission Ridge Long-Term Holding Pasture in

South Dakota (up to 1,000 horses on 46,142 acres) EA at AR 29159- 29176; Strohm Wild Horse

Long-Term Holding Facility in Oklahoma (1,000 horses on 8,850 acres) EA at AR 28576 -

28625; Herd Wild horse Long-Term Holding Facility in Oklahoma (1,000 horses on 8,203 acres)

EA at AR 28490 - 28524; (Foraker, Oklahoma Long Term Holding Facility in Oklahoma (2,400

horses on 17,042 acres) EA at AR 28374-28471; Pawhuska Wild Horse Long-Term Holding

Facility in Oklahoma (4,200 head on 25,933 acres) EA at AR 28317-28370; Hulah Wild Horse

Long-Term Holding Facility in Oklahoma (2,200 horses on 20,350 acres) EA at AR 28253 -

28316; Grenola Wild Horse Long-Term Holding Facility in Kansas (2,200 horses on 15,221

acres) EA at AR 28206 - 28252; Teterville East and West Wild Horse Long-Term Holding

Facility in Kansas (4,000 horses on 32,390 acres) EA at AR 27983 -28009; Catoosa Wild Horse

Long-Term Holding Facility in Oklahoma (2,000 horses on 9,446 acres) EA at AR27933-27962;

Gray Horse East and West Wild Horse Grassland Facility in Oklahoma (3,500 horses on 26,894

acres), EA at AR 28763 – 28804; White Horse Wild Horse Long-Term Holding Facility in South

Dakota (1,500 horses on 51,276 acres) EA at AR 28909–28940.  Each of these EAs examines the

environmental impacts of the placement of excess horses on the facility, including the private

contractor's care and maintenance of the wild horse herd.  For example, the EA for the Catoosa

facility examined the environmental impacts of the following action:

> The action involves placing up to 2,000 wild horses on private lands via contract
> which also requires the contractor to maintain and care for the animals.

AR 27934.

Contrary to IDOA's erroneous and misleading characterizations of these long-term

facilities (IDOA's Motion for Summary Judgment ("IDOA's MSJ") at 28), these facilities are

spacious and most have wooded areas that provide the horses with diverse habitat and shelter.

For example, the Bartlesville facility has open stands of blackjack oak and post oak trees (AR

28634); Gray Horse East and West facility has open stands of blackjack oak, post oak, and

hickory trees. (AR 28769);  Foraker facility has scattered patches of buttonbrush, persimmon and

false indigo (AR 28391); Pawhuska facility has Osage orange, winged elm, hackberry,

buttonbush and false indigo (AR 28329); Hulah facility has Osage orange, catalpa, winged elk,,

hackberry, buttonbush, false indigo, water oak, mossycup oak, pecan and sycamore (AR 28264);

Grenola facility has Osage orange, catalpa, winged elm, hackberry, buttonbush, false indigo,

water oak, mossycup oak, pecan and sycamore (AR 28216); Catoosa facility has oak, elm,

hickory, ash and hackberry (AR 27943).  Photographs in the Administrative Record reflect the

true nature of these sanctuaries, disputing Plaintiffs' mischaracterizations. AR 28010-28105.

### D.   Pertinent Facts Pertaining to this Litigation

Plaintiffs filed suit to challenge the Bureau's capture plan on November 23, 2009 (Dkt.

1). On December 23, 2009, this Court denied IDOA's preliminary injunction motion.  (Dkt. 25).

The court ruled that IDOA did not show a likelihood of success on the merits of their challenge

to the legality of the Bureau's process for gathering the horses and that Plaintiffs' assertions of

irreparable harm, the balance of harms and the public interest did not overcome the weakness of

the merits showing.  In *Defense of Animals v. Salazar*, 2009 WL 4981172 *7 (D.D.C.  2009)  On

IDOA's challenge to the Bureau's plan to relocate the Complex's excess horses to long-term

facilities outside of Nevada, the Court ruled that IDOA had shown a likelihood of success on the

merits, but failed to demonstrate the requisite likelihood of an imminent irreparable injury.  *Id*. at

*8-12. The Court found insufficient evidence, in the appropriations legislation, of Congress'

purposeful funding of the long-term holding facilities.  *Id*. at *11.  Nonetheless, the Court opened

the door to the Bureau, and presumably to the Defendant-Intervenors, to "present more

convincing arguments in favor" of the legality of the long-term holding of excess horses.  *Id*.  On

January 19, 2010, the Court granted the motions to intervene of Safari Club and of the State of

Nevada. (Dkt.  35).

18

# IV.   ARGUMENT

## A.    The Plaintiffs Have Failed to Demonstrate Standing

Plaintiffs IDOA, Downer, and Farley have all failed to prove that they have Article III standing to bring their claims.   IDOA provides no evidentiary support for their standing allegations, which allegations are deficient in any event.   Downer and Farley's asserted grounds for standing fail because they do not allege all the factors to establish standing.   As the D.C. Circuit recently explained:

> The three factors establishing the irreducible constitutional minimum of standing are well established. …
>
> > First and most relevant here is injury-in-fact:  A would-be plaintiff must have suffered an invasion of a legally protected interest that is (i) concrete and particularized rather than abstract or generalized, and (ii) actual or imminent rather than remote, speculative, conjectural or hypothetical.  …
> >
> > Second is causation:  The asserted injury must be fairly traceable to the challenged action of the defendant.
> >
> > Third is redressability: It must be likely that a favorable decision by the court would redress the plaintiff's injury.

*In Re Navy Chaplaincy*, 534 F.3d 756, 759-60 (D.C. Cir. 2008) (citations and internal quotation marks omitted).   The D.C. Circuit went on to explain the importance of the standing doctrine.

> "[T]he law of Art. III standing is built on a single basic idea—the idea of separation of powers. …   The doctrine is founded in concern about the proper—and properly limited—role of the courts in a democratic society. The federal courts are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution. Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive."

*Id.* (citations and internal quotation marks omitted).   Finally, "an inescapable result of any standing doctrine application is that at least some disputes will not receive judicial review.   That analysis of a party's standing should sometimes dictate this result is not a reason to reject either

19

the result or the analysis." *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 665-66 (D.C. Cir. 1996).[6]

### 1. In Defense of Animals Has Not Supported Its Vague Allegations of Standing

Plaintiff In Defense of Animals provides no evidentiary support for its minimal argument on standing. See IDOA's MSJ at 4-5 (discussing IDOA's interest and involvement in the horses at the Complex). At the summary judgment stage, the courts "require specific facts, not 'mere allegations,' to substantiate each leap necessary for standing." *Florida Audubon,* 94 F.3d at 666; *see also Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992) (requiring specific facts by affidavit). IDOA provides no declaration or affidavit in support of these factual allegations. *Compare* IDOA MSJ at 4 n.3 ("The factual allegations regarding Mr. Downer and Ms. Farley come from their sworn declarations…."). Again without evidentiary support, IDOA claims that its "supporters visit and enjoy viewing these wild horses on public lands." This extremely vague allegation, even if supported by evidence, fails to meet the injury in fact requirement. It does not even assert that these unspecified "supporters" intend to visit the Complex to view horses, much less that they have definite plans to do so. *See Lujan,* 504 U.S. at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when*

---

[6] In terms of showing injury and causation, the standing analysis is essentially the same for IDOA's substantive claims under the Administrative Procedure Act (Counts 1-3) and procedural claim under the NEPA (Count 4). Procedural claims require a showing of an injury in fact caused by the defendant's actions. *Florida Audubon,* 94 F.3d at 664-65, 669. While for procedural claims the courts relax the showing of immediacy and redressability, the courts do not eliminate them. *Lujan,* 504 U.S. at 572 n.7. The courts relax immediacy because in some cases the completion of underlying project can take years (*e.g.,* constructing a dam). *Id.* The courts relax redressability only in the sense that a remand for proper NEPA compliance, for example, may not result in a new agency decision that redresses the plaintiff's underlying on-the-ground injury, as the agency could make the same substantive decision after remand and proper NEPA compliance. *Id.* But if the result that would arguably actually redress the plaintiff's injury – here return of the excess horses to the Complex range – is not available under the law, then the plaintiff has failed to satisfy the redressability requirement, even for a procedural claim.

the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.").  Finally, it is at least doubtful that alleged injuries to the "supporters" of an organization can provide the injury to a "member" of an organization required for organizational standing.  *See Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 334, 343 (1977) ("association has standing to bring suit on behalf of its members only when" three conditions are met, including standing of "members" and that litigation does not require "the participation of individual members in the lawsuit.").

### 2.  Downer and Farley Fail to Establish Injury, Causation, and/or Redressability

Downer and Farley, although they at least rely on sworn declarations, fail to establish all the factors necessary for standing.  They challenge two aspects of the Bureau's plan:  (1) the removal of the horses from the Complex, and (2) the transfer of the horses to long-term facilities out of state.  IDOA MSJ at 10-22, 22-28.  Based on these claims, they allege injuries due to a reduced aesthetic and professional experience in viewing the horses in the wild on the Complex. *Id.* at 6-7.  Their alleged injuries, arising from the removal of the horses from the Complex to short-term holding facilities, is defective because the potential remedy for this alleged injury – return of the horses to the wild in the Complex -- is not available, as this Court has already found.  Thus, Downer and Farley have not shown and cannot show that the Court could redress their alleged injuries.  Similarly, the transfer of the horses to long-term facilities does not cause the alleged harm of seeing fewer horses during (unspecified) future visits to the Complex and an injunction barring such transfers would not redress these alleged injuries.  Finally, the allegations of Downer and Farley for both asserted bases of injury also suffer from presenting only vague "some-day intentions" of visiting the areas of the Complex where horses might reside.

### 3. Downer and Farley Have Not Proven that the Court Can Redress Their Alleged Injury of Viewing Fewer Horses on the Range During Future Visits

To redress Downer and Farley's alleged aesthetic injuries due to there being fewer horses in the wild on the Complex following the gather, the Court would have to order the Bureau to release the excess horses back into that area. As this Court has already found in rejecting the preliminary injunction, "[t]he Wild Horse Act provides no authority for the agency to release excess horses back onto the range; in fact, given the statute's mandate that removal of those horses occur 'immediately,' the statute may be fairly read to prohibit such a release." *In Defense of Animals v. Salazar,* 2009 WL 4981172, *12 (D.D.C. 2009). IDOA has argued nothing to suggest that this holding is incorrect or that the Court has the authority to order the release of the excess horses back onto the Complex.

The Court should again hold that it cannot redress these alleged injuries by ordering the release of the excess horses back to the range. *See Taylor v. Resolution Trust Co.,* 56 F.3d 1497, 1508 (D.C. Cir. 1995) (the preliminary injunction "inquiry overlaps with the standing issue somewhat; without adequate proof of a threatened injury, plaintiff lacks both standing and an adequate basis in equity for an injunction."). Although the showing is different, *id.,* like demonstrating entitlement to a preliminary injunction, proving standing requires evidentiary support of the allegations. *See Lujan,* 505 U.S. at 561 ("In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e)."). Assuming that Downer and Farley have proven a recognizable injury and causation (discussed below), they fail to demonstrate redressability and therefore have no standing to bring their claims.[7]

---

[7] IDOA's unarticulated "potential solution" to the  Bureau's "conundrum", which allegedly would somehow entail returning the excess horses to the range, IDOA MSJ at 29, cannot provide

### 4. The Transfer of the Excess Horses to Long-Term Facilities Would Not Cause the Alleged Injury of Viewing Fewer Horses on the Range

IDOA's standing to stop the transfer of the excess horses to long-term facilities out of state fares no better.  A plaintiff must demonstrate that (1) the proposed federal action that the plaintiff seeks to halt is the cause of the alleged injury and (2) the court can redress the injury, especially when other events separate the agency action and the alleged injury.  *Center for Law and Educ. v. Dept. of Labor,* 396 F.3d 1152, 1160 n.2 (D.C. Cir. 2005) (when "the purported cause of injury (i.e., promulgation of final rules) and the injury itself is separated by intervening actors and events, the causation and redressability inquiries may appear to merge. In such cases, both prongs of standing analysis can be said to focus on principles of causation:  fair traceability turns on the causal nexus between the agency action and the asserted injury, ....") (citation omitted).  None of the declarations allege that the transfer to long-term facilities, as opposed to the actual gather and removal of the horses from the wild at the Complex—the "intervening event"—caused any harm to Downer and Farley's alleged aesthetic interest in viewing the horses on the range at the Complex.  Both declarations only assert that Downer and Farley have plans to

---

the basis for proving redressability and Article III standing.  First, IDOA has provided no factual or legal details of how this would be possible given the provisions of the Wild Horses Act on which the Court relied.  *In Defense of Animals,* 2009 WL 4981172 at *12.  Second, the redressability factor requires that the Court, not the parties or Congress, be able to redress the alleged injury.  To the extent it is discernable at all, it appears that IDOA's potential solution would require Congress passing a new law.  IDOA MSJ at 30 ("Plaintiffs are working on a proposal to present to Defendants and to Congress which would permit [the horses'] return to the range and their natural habitat."); *U.S. Ecology, Inc. v. Department of the Interior,* 231 F.3d 20, 24 (D.C. Cir. 2000) ("Courts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials" and third parties).  And finally, IDOA must establish standing at the time of filing the relevant pleading (here at latest with the filing of the Second Amended Complaint), not some undefined future time.  *See Newman-Green, Inc. v. Alfonzo-Laurain,* 490 U.S. 826, 830 (1989) ("The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed."); *Natural Law Party of the United States of America v. Federal Election Comm'n,* 111 F.Supp.2d 33, 41 (D.D.C. 2000) ("Standing is based upon the facts as they exist at the time the complaint is filed, ....").

visit the range of the Complex in the future.  Supplemental Affidavit of Craig C. Downer, ¶ 2, Dkt. 14-1 (toured all five Complex  "herd management areas; "I plan to make several more tours of the area in the near future, ….); Affidavit of Terri Farley, ¶ 7, Dkt. 14-2 ("I also plan to return to the Calico range after the proposed gather in order to view the wild horses…."). In short, the initial gather of the horses is what caused any alleged harm.  The proposed transfer causes no further harm.

As with the removal from the range standing issue, the Court has already specifically recognized the flaw in the transfer standing argument in terms of redressability.  After noting Downer's claim of injury due to a reduced number of horses after the gather, the Court explained that stopping the transfer of the horses to long-term facilities would not redress the injury:  "The most obvious problem with this argument is that a preliminary injunction against the long-term holding of horses will not cure the asserted injury.  … Even if BLM is enjoined from placing any horses in *long-term* holding facilities outside the state of Nevada, the agency still will be entitled to take those horses from the range for some undefined period in the *short-term.*"  *In Defense of Animals,* 2009 WL 4981172 at *12.[8]  Similarly, redressability for purposes of standing is lacking because even barring the transfer of the horses to long-term facilities would not ensure the return of the horses to the wild on the Complex range, where, presumably, Downer and Farley could view them.  *Id.* (Wild Horses Act does not authorize release of excess horses back on the range and may prohibit it).

---

[8] The Court noted that the Federal Defendants had raised this issue in oral argument as relevant to IDOA's standing, but because the Federal Defendants had not raised it in a motion to dismiss, did not address it as part of its ruling on the preliminary injunction.  *In Defense of Animals,* 2009 WL 4981172 at *12 n.9.

### 5. "Some Day" Intentions to Return to An Area are Insufficient to Establish Standing

Also undermining their alleged aesthetic and professional interest in viewing the horses, neither Downer nor Farley has established "definite plans" to visit the horses in the wild at the Complex at any particular time in the future.[9]  In *Lujan,* the Supreme Court rejected as insufficient to establish standing the plaintiffs' assertions that they intended to return to the affected area in the future, "without any description of concrete plans, or indeed even any specification of *when* the some day will be."  504 U.S. at 564 & n.2.  The total of Downer's allegations of definite plans is that he toured the Complex aerially in December 2009 and "plan[s] to make several more tours of the area in the near future, to further the studies I have made on these specific animals and herds."  Supplemental Affidavit of Craig C. Downer, ¶ 2, Dkt. 14-1.  Farley states even less.  "I plan to return to the Calico range after the proposed gather in order to view the wild horses for both my personal aesthetic enjoyment and my professional writing interests."  Affidavit of Terri Farley, ¶ 7, Dkt. 14-2.  Like the allegations in *Lujan,* the allegations here come up short.

In the end, the Plaintiffs have demonstrated a strong interest in the horses of  the Complex, but little else in terms of meeting their burden to establish standing.  *See Steel Co.,* 523 U.S. at 103-04 (party who is trying to invoke the court's jurisdiction bears the burden of establishing standing).  Even a strong and longstanding interest in seeing a law implemented legally does not establish standing.  *See Taylor at* 1507 (plaintiff's "doubtless sincere interest in promoting the underlying purposes of the RTC Whistleblower Act is not enough to support

---

[9] If the Court decides standing on causation and/or redressability grounds, it need not even reach the injury in fact issue.  *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 105 (1998) (court did not address injury in fact because "the complaint fails the third test of standing, redressability.").

standing to sue under that statute; otherwise, any party that bothered to sue would *ipso facto* locate itself within the relevant zone of interests"; discussing prudential standing).

> As the Supreme Court has often stated, mere personal offense to government action does not give rise to standing to sue. … By the mere bringing of his suit, *every* plaintiff demonstrates his belief that a favorable judgment will make him happier.  But although a suitor may derive great comfort and joy from knowing that the Government is following constitutional imperatives, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury.  Recognition of standing in such circumstances would transform the federal courts into no more than a vehicle for the vindication of the value interests of concerned bystanders."

*In Re Navy Chaplaincy*, 534 F.3d at 763 (citations and internal quotation marks omitted).  To avoid this result, the Court should dismiss IDOA's claims on standing grounds.

### B.   The Wild Horses Act Provision Governing the Relocation of Horses Does not Address Relocating Excess Horses to Private and/or Non-Public Lands

The Wild Horses Act's prohibition against moving horses is unambiguous.  It precludes the Bureau from relying on the authority of the Wild Horses Act to move wild horses onto public lands where they did not exist at the time the law was enacted:

> Nothing in this chapter shall be construed to authorize the Secretary to relocate wild free-roaming horses or burros to areas of the ***public lands*** where they do not presently exist.

16 U.S.C. §1339 (emphasis added)  The statute also unambiguously defines the phrase "public lands" as "any lands administered by the Secretary of the Interior through the Bureau of Land Management or by the Secretary of Agriculture through the Forest Service."  16 U.S.C. § 1332(e).

Not one of the long-term holding facilities identified in the Administrative Record as a site for the future relocation of the Complex's excess horses is located on "public land" as defined by the Wild Horses Act.  Most of the facilities are located exclusively on private lands, one is partially situated on Bureau of Indian Affairs lands and another encompasses some

privately run state lands.  By transferring excess horses to non-public lands, the Bureau could not

possibly violate the limitation on its authority under the Wild Horses Act concerning the

relocation of horses to public lands.

### C. The Wording and the Legislative History of Appropriations Laws Provides the Requested Evidence of Congress' Approval of Long-Term Facilities.

Congress has expressed its approval of long-term holding facilities for unadoptable

excess horses.  In denying IDOA's preliminary injunction motion, this Court explained its

reluctance to accept less than an express legislative affirmation of Congress' intent to fund the

Bureau's use of long-term holding facilities as evidence of Congress' approval of that strategy

for managing excess wild horses.  The Court relied on *Fund for Animals, Inc. v. U.S. Bureau of

Land Management*, 460 F.3d 13, 19, n. 7 (D.C. Cir. 2006), and  *Schism v. United States*, 316

F.3d 1259, 1289 (Fed. Cir. 2002) for guidance in its search for confirmation from the language of

the appropriations bill:

> Because Congress has never, to the Court's knowledge, stated in an appropriations
> act that BLM is authorized to use funds for the long-term holding of wild horses,
> BLM cannot derive any legal authority to engage in that practice from the statutes
> that appropriate funds for the agency.

*In Defense of Animals v. Salazar*, 2009 WL 4981172, *11 (D.D.C. 2009).

The *Schism* case, upon which this Court relied, sought evidence from an appropriations

bill that "expressed a purpose to bestow authority" on the agency to carry out the challenged

activity.  316 F.3d 1259 at 1290.   In the instant matter, Congress has provided evidence of that

express purpose both in the legislative history and in the appropriations language itself.  That

express purpose appears in the legislative history of Congress' approach to the 1988

appropriations for the Bureau's management of wild horses -- the bill in which Congress first

introduced the restriction on funding for the destruction of wild horses.  In those discussions and

in the discussions of appropriations for years to follow, Congress expressly acknowledged and

approved the Bureau's use of private sanctuary facilities for the long-term holding of excess

horses.  The juxtaposition of these approval discussions and the same appropriations committees'

discussions of restrictions against the use of funds for the destruction of horses, demonstrates

that the drafters were both aware and supportive of this approach to excess horse management.

Even more significant, however, is the language that Congress used to formulate the

funding restriction.  Congress did not simply prohibit the use of funds for excess horse

destruction by the Bureau.  Instead Congress distinctly specified that at least some of the excess

horses that may be the subject of destruction efforts are in the care of "contractors."  The drafters

prohibited the Bureau from using funds "to carry out the destruction of healthy, unadopted, wild

horses and burros *in the care* of the Bureau of Land Management *or its contractors*."  133 Cong.

Rec. H5524 (daily ed. June 25, 1987), Exhibit A.(emphasis added).

By purposefully including language pertaining to horses in the care of the Bureau's

contractors, Congress endorsed the Bureau's use of non-restricted funds to pay these contractors.

The fact that Congress found it necessary to expressly limit the use of funding being channeled

to the contractors for these long-term facilities demonstrates Congress' intent to otherwise fund

these sanctuaries and to facilitate the Bureau's continued use of the facilities.[10]

The U.S. Supreme Court has noted that Courts should be wary of accepting

Congressional silence as ratification of an agency's interpretation of its authority.  However,

when Congress is undeniably cognizant of the agency's interpretation, has demonstrated its

ability to reject that interpretation by amending other portions of the statute being interpreted,

---

[10] Safari Club has not been able to find any indication from the *Fund for Animals* opinion or
from the briefing on that case, accessible through Westlaw, that the D.C. Court of Appeals was
made aware of or considered the legislative history of the 1987 or other appropriations bills
provisions pertaining to private sanctuaries presented to this Court in this Memorandum in
Support.

and yet refrains from doing so, the Supreme Court has acknowledged this conduct as affirmation

of the agency's approach.

> [O]nce an agency's statutory construction has been fully bought to the attention of
> the public and the Congress, and the latter has not sought to alter that
> interpretation although it has amended the statute in other respects, then
> presumably the legislative intent has been correctly discerned.

*United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979) (citations omitted) (court deferred to

FDA's Congressionally undisturbed, albeit publicly controversial, practice of not applying

exemption to approvals for drugs taken by terminally ill patients).  In the instant matter,

Congress expressly restricted the Bureau's use of funds for the destruction of horses in the care

of these contractors, whom Congress was aware operated long-term holding facilities.  Congress

could just as easily have placed a similar restriction on the Bureau's use of funds to operate these

facilities.  The fact that the drafters acknowledged and approved the use of these facilities and

declined the opportunity to restrict funding for their use provides the type of ratification

approved by the Supreme Court.

### D.  This Court Should Not Adopt A Statutory Interpretation That Undermines the Sense and Purpose of the Wild Horses Act

The Bureau in the first instance, and the Court in reviewing the Bureau's actions, should

give effect to the sense and purposes of the Wild Horses Act in resolving conflicts in the law

about the management of unadoptable excess wild horses.  Regarding one option for dealing

with these horses, Congress gave the Bureau two ostensibly contradictory statutory directives.  In

the Wild Horses Act, Congress directed the Bureau to "cause additional excess wild free-

roaming horses and burros for which an adoption demand by qualified individuals does not exist

to be destroyed in the most humane and cost efficient manner possible."  16 U.S.C.

§1333(b)(2)(C).  And yet, year after year, in appropriations legislation, Congress effectively

mandated the exact opposite by depriving the Bureau of any funding "to carry out the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau of Land Management or its contractors." These healthy, unadopted horses exist because the Bureau must remove excess horses from the range. *In Defense of Animals v. Salazar*, 2009 WL 4981172 *12 (D.D.C. 2009) Where there are seemingly conflicting pieces of legislation, the rules of statutory construction require that, to the extent possible, Courts give effect to both:

> The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. 'When there are two acts upon the same subject, the rule is to give effect to both if possible . . ..'

*Morton v. Mancari*, 417 U.S. 535, 551 (1974) (court held that Native American Employment preference dictated by the Indian Reorganization Act was not impliedly repealed by the Equal Employment Opportunities Act of 1972) quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939).

To give effect to the conflicting statutes, it is not enough to simply find some element of each law that can be applied. The rules of statutory interpretation require that that the Court "read the statutes to give effect to each if we can do so 'while preserving their sense and purpose.'" *Watt v. Alaska*, 451 U.S. 259, 267 (1981) (citations omitted) (court reconciled potential conflict between 1964 amendments to Wildlife Refuge Revenue Sharing Act of 1935 and Mineral Leasing Act of 1920).

The sense and purpose of the appropriations language is to prohibit the destruction of excess horses. The sense and purpose of the Wild Horses Act is to achieve healthy herds of horses in a thriving natural ecological balance with other species sharing the same habitat on public lands. 16 U.S.C. § 1333. To preserve the sense and purpose of both, this Court must

assess how Congress wishes the Bureau to achieve healthy horse herds and a thriving natural ecological balance without destroying excess horses.  Congress clearly demonstrated what it did *not* want the Bureau to do with the excess unadoptable horses (*i.e.,* destroy them).  This Court has already rejected, as illegal, the option of returning the horses to the range.  In denying the preliminary injunction, this Court explained that "[t]he Wild Horse Act provides no authority for the agency to release excess horses back onto the range; in fact, given the statute's mandate that removal of those horses occur 'immediately,' the statute may be fairly read to prohibit such a release."  *In Defense of Animals,* 2009 WL 4981172 at *12.  The Court can resolve any ambiguity over what Congress *does* want the Bureau to do with those horses by upholding the Bureau's reading of the appropriations act (as discussed in the above section).

On the other hand, if this Court interprets Congress' appropriations bill as a failure to identify a specific appropriations line item for funding of long-term holding facilities, it will create an implicit management prohibition.  That interpretation will destine the Complex's excess unadoptable horses to remain in overpopulated corrals on small short-term facilities on a long-term basis.  Such an outcome cannot come close to the thriving natural ecological balance or healthy herd conditions sought by the Wild Horses Act's drafters and would undermine the sense and purpose of the Wild Horses Act.

Other rules of statutory construction allow the Court to avoid this result.  They recommend caution to courts that must reconcile statutory conflicts that include appropriations provisions.   Courts must be wary to avoid allowing appropriations provisions to broadly interfere with the substantive provisions of underlying legislation.  The D.C. Circuit has acknowledged "the established rule that, when appropriations measures arguably conflict with the underlying authorizing legislation, their effect must be construed narrowly."  *Donovan v.*

*Stalite Co.*, 734 F.2d 1547, 1558 (D.C. Cir. 1984) (Federal Mine Health Safety Act appropriations provision restriction against use of funds to enforce standard, rule, regulation or order held not to prohibit the Secretary of Labor from appealing an order from the Federal Mine Safety and Health Review Commission). If Congress has removed the option of destroying unadoptable excess horses, the only way that the sense and purpose of the two statutes can be reconciled is to allow the Bureau to continue doing exactly what they have done for decades with Congress' assent and approval.  Horses can be managed appropriately on public lands within their home range in balance with other wildlife species without 1) destroying the excess horses, 2) returning excess populations to the range or 3) relegating the unadopted horses to prolonged, crowded storage in small short-term facilities.  The sense and purpose of both laws can be achieved by allowing the Bureau to continue to relocate excess horses to one or more of the privately owned and run sanctuaries in Oklahoma, Kansas or South Dakota.

### E.  Section 1732(b) Authorizes the Bureau to Transfer the Horses to Long-Term Facilities

Regardless of the Bureau's authority under the Wild Horses Act or the appropriations bills, the Federal Land Policy and Management Act ("FLPMA") broadly authorizes the Secretary of the Interior, and the Bureau, to take "any action" to protect public lands under the Bureau control.  43 U.S.C. § 1732(b) ("In managing the public lands the Secretary shall, by regulation **or otherwise**, take **any action** necessary to **prevent unnecessary or undue degradation of the lands**.") (emphasis added).  The "any action" that FLPMA authorizes would include not only the removal of the destructive horses from the range, but their "disposal" by any means necessary. The Supreme Court has confirmed a broad reading of such authority.

Under comparable laws, the Supreme Court upheld a district court decision that allowed the Department of Agriculture to lethally reduce deer that were degrading the Federal lands and

to dispose of the deer as necessary.  *Hunt v. U.S.,* 278 U.S. 96, 99-100 (1928) ("*Hunt S.Ct.*"),

*affirming U.S. v. Hunt,* 19 F.2d 634 (D. Az. 1927) ("*Hunt D.Ct.*").  The *Hunt* cases involved an

overabundance of deer in a unit of the National Forest (the Kaibab National Forest and Grand

Canyon National Game Reserve ("Kaibab Unit")) just north of Grand Canyon National Park.

*Hunt D.Ct.,* 19 F.2d at 635.  "The result has been that these deer have greatly injured the lands in

the reserves by overbrowsing upon and killing valuable young trees, shrubs, bushes, and forage

plants.  Thousands of deer have died because of insufficient forage." *Hunt S.Ct.,* 278 U.S. at 99.

A number of acts of Congress gave the Department of Agriculture authority to "preserve the

forest on said national forest and game reserve land from destruction."  *Hunt D.Ct.,* 19 F.2d at

636.

Using this authority, the Secretary attempted to address the problem by, among other

things, "remov[ing] some of the deer from the reserves to other lands." *Hunt S.Ct.,* 278 U.S. at

100; *Hunt D.Ct.,* 19 F.2d at 636 (Secretary "attempted to reduce the number of deer by shipping

live deer to other section of the United States for use in restocking state game preserves and

private parks.").  Because these efforts failed, the Secretary "proceeded to kill a large number of

the deer and ship the carcasses outside the limits of the reserves."  *Hunt S. Ct.* 278 U.S. at 100.

"The direction given by the Secretary of Agriculture was within the authority conferred upon

him by act of Congress."  *Id.*  Thus, the Congressional Acts authorizing the Secretary to protect

the lands from destruction authorized both relocating the deer to other areas of the country and

killing and removing the deer.[11]

_____

[11] The main legal issue in the *Hunt* cases was whether the State of Arizona could constrain the
Federal government's action in hunting and transporting the deer in violation of State law (the
Court held that under the Property Clause, the Federal authority was not constrained by State
law).  *Hunt S.Ct.,* 278 U.S. at 100.  Nonetheless, the Courts' discussion of the authority of the
Federal agency bears directly on the Bureau's authority here under FLPMA Section 1732(b).

Here, instead of killing the excess animals, the Bureau has arranged for the storage of the horses on long-term holding facilities.  *See In Defense of Animals,* 2009 WL 4981172 at *7.  Just as the statutory authority at issue in *Hunt* authorized the relocation, or killing and disposal, of destructive excess deer, Section 1732 of FLPMA is broad enough to authorize all the steps necessary to remove the horses to "prevent unnecessary or undue degradation of the lands."  One step, particularly if the horses would continue to degrade the short-term facilities, would be to find a place to house the animals more permanently off the range.

For three reasons, Section 1339 does not constrain this authority in FLPMA Section 1732(b) to transfer wild free-roaming horses to private lands outside of Nevada.  First and foremost, if the statutory authority is outside the Wild Horses Act, Section 1339 is inapplicable, as it is only a limitation on construing the Bureau's authority ***under the Wild Horses Act***.  16 U.S.C. § 1339 ("Nothing in this chapter ….").  FLPMA Section 1732(b) is not within the Wild Horses Act.  Second, as discussed elsewhere, the holding facilities are on private lands, not "areas of the public lands …."  *Id.*  And third, even if it did apply to transfer to private lands, this section appears designed to prevent the introduction of wild free-roaming horses into the wild (*i.e.,* other open space where they might establish new range).

Whether or not the Court finds authority to transfer excess horses to long-term holding facilities in any appropriation act, Section 1732(b) of FLPMA provides such authority.  If the removal and transfer is necessary to "prevent unnecessary and undue degradation of the lands," this section authorities it.  The Administrative Record establishes that the excess horses are degrading the land.  Transfer to long-term holding facilities, including pastures with abundant grazing areas, is within the "any action necessary" to protect the lands (including the short-term

Both laws broadly direct the agency to protect the land from destruction.  Both authorize the removal and disposal/transfer of the destructive animals off the lands.

facilities themselves.  Nothing in the Wild Horses Act constrains this FLPMA authority.  The
Court should uphold the transfer proposal.

### F. The Bureau's Environmental Assessment for the Round-Up and Capture Complied with NEPA Requirements

Through the gather EA and numerous other EAs related to the long-term facilities, the
Bureau has satisfied its NEPA obligations.  Ignoring the numerous EAs that the Bureau
completed to assess the environmental impacts of the long term maintenance of horses at the
various private sanctuary facilities in Oklahoma, Kansas and South Dakota, IDOA claims that
the Bureau failed to sufficiently investigate the "indirect" ramifications of the horse capture.
IDOA wants the Bureau to conduct a NEPA analysis on the future lives of the horses once they
are transferred to long-term facilities. This challenge translates to a demand that the Bureau
duplicate the NEPA process for actions that the Bureau has already assessed in these numerous
other EAs.

NEPA provides procedural, rather than substantive requirements, and does not elevate
redundancy over thorough but concise environmental assessments.  The regulations providing
the framework for EAs call for a "*concise* public document," that "*briefly* provide[s] sufficient
evidence" and "include[s] *brief* discussions of the need for the proposal."  40 C.F.R. § 1508.9(a),
(a)(1) and (b) (emphasis added).  The case law also reflects an acknowledgement that NEPA
requirements should not hamstring a federal agency from conducting the chosen action.  "[T]he
Act was not intended to create a bureaucratic nightmare in which form rather than substance
governs."  *Coalition for Lower Beaufort County v. Alexander*, 434 F. Supp. 293, 295 (D.D.C.
1977) (court rejected a NEPA challenge based on a technical deviation in NEPA procedure in
which the agency decisionmaker failed to consider a document that contained the same
information available in other documents that he had reviewed.).

The Bureau has already complied with its NEPA requirements for the long-term holding of horses on each of the facilities that the excess horses could be sent.  **See Section III C infra.** All "indirect" consequences have previously been assessed.  When the excess horses from the Complex are released for transfer to one or more of these private facilities, the appropriate NEPA documents pertaining to the horses' ultimate destination will apply.  No further NEPA compliance is required.

## V.     CONCLUSION

IDOA lacks standing, depriving the Court of the jurisdiction to consider their claims. IDOA's challenge to the legality of the capture has no merit.  Similarly, IDOA's challenge to the relocation of excess horses to long-term facilities must fail.  All such facilities are located on private or non-public lands and nothing in the Wild Horses Act prohibits the Bureau from relocating horses onto private or non-public lands.  The legislative history and the language of the appropriations legislation governing the Bureau's budget demonstrate Congress' express approval of the Bureau's use of long-term holding facilities.  To not find authority to place excess horses on private long-term facilities would inappropriately limit the impact of the appropriations made to the Bureau and would completely undermine the sense and purpose of the Wild Horses Act.  In any event, FLPMA directs and authorizes the Bureau to take action, including the removal and transfer of horses, to protect Bureau lands from the destruction being caused by the wild horse overpopulation.  Finally, the Bureau has already fulfilled its NEPA obligations with respect to the placement of excess wild horses on long-term facilities, in the form of the individual EAs completed for each of those long-term facilities.

Safari Club respectfully requests that the Court grant Safari Club's Cross-Motion for Summary Judgment, and the summary judgment motions of the Federal Defendants and all

Defendant-Intervenors, that the Court deny IDOA's Motion for Summary Judgment and that the

Court dismiss all IDOA's claims in their Second Amended Complaint.

Dated:  March 17, 2010.

Respectfully Submitted,

/s/ Anna M. Seidman_____
Anna M. Seidman
D.C. Bar No. 417091
Douglas S. Burdin
D.C. Bar No. 434107
Safari Club International
501 2nd Street, NE
Washington, DC 20002
Tel:  (202) 543-8733
Facsimile:  (202) 543-1205
aseidman@safariclub.org
dburdin@safariclub.org
*Counsel for Defendant-Intervenors*
*Safari Club International and Safari Club*
*International Foundation*